```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
      LYNNETTE MASON,
 3
           Plaintiff,
 4
      vs.                                No. CIV-2020-1217-D
 5
      STATE FARM MUTUAL AUTOMOBILE
 6    INSURANCE CO., d/b/a STATE FARM
      INSURANCE CO., a Foreign
 7    For-Profit Entity,
 8         Defendant.
 9
              VIRTUAL VIDEO DEPOSITION OF JAMES HARMON
10               Taken on Behalf of the Plaintiff
              On July 7, 2022, beginning at 10:03 a.m.
11            All Parties Appearing Remotely Via Zoom
12                        APPEARANCES:
13    Appearing on behalf of the PLAINTIFF
14            Jacob Rowe
              Simone Fulmer Gaus
15            Dimitri Flowers, Intern
              FULMER SILL
16            1101 N. Broadway
              Suite 102
17            Oklahoma City, Oklahoma 73103
              405-510-0077
18            jrowe@fulmersill.com
              Sfulmer@fulmersill.com
19
      Appearing on behalf of the DEFENDANT
20
              Joseph T. Acquaviva, Jr.
21            WILSON, CAIN & ACQUAVIVA
              300 Northwest 13th Street, Suite 100
22            Oklahoma City, Oklahoma 73103
              405-236-2600
23            Jtaqua@sbcglobal.net
24    Videographer:  Stesha Snow
25    Reported By:  Becky C. Dame, CSR, RPR
```

1  claims?

2      A    That would have been when I was in Lawton.

3      **Q    So you have been familiar with first-party**

4  **bodily injury claims in the State Farm auto policies**

5  **from the late '90s to present; right?**

6      A    Yes.

7           MR. ROWE:  Jay, that's a good place for us

8  to break.  See you guys shortly.

9           MR. ACQUAVIVA:  Thank you.

10           THE VIDEOGRAPHER:  We're off the record at

11  11:15 a.m.

12           (Off the record)

13           THE VIDEOGRAPHER:  We're back on the

14  record at 11:27 a.m.

15  BY MR. ROWE:

16      **Q    So that last section of testimony before**

17  **we took our break, Mr. Harmon, was about partly your**

18  **experience at State Farm, and you talked to us about**

19  **your tenure as an auto superintendent where you had**

20  **individual adjusters handling claims under an auto**

21  **policy, kind of start to finish.**

22           **If there was one accident in that**

23  **universe, the auto superintendent universe, late**

24  **'90s, that involved claims for liability and claims**

25  **for underinsured or uninsured motorist benefits**

1    under the same policy, would that same adjuster be

2    handling both of those claims back at that time?

3         A    I believe so, yes.

4         Q    So back in the late '90s, State Farm would

5    not have been bifurcating liability claims from UM

6    claims under the same policy?

7         A    I don't recall they did, but that's --

8         Q    Okay.

9         A    That's a long time ago.

10        Q    I bet.

11             I would colloquially refer to a situation

12   like that as a double-insured or a single-adjuster

13   type of handling of those two claims.  I think in

14   the claims file there's an abbreviation "D/W."  That

15   stands for "double width"; is that right?

16        A    Correct.

17        Q    Okay.  But in that time period, in the

18   late '90s or after, State Farm was allowing

19   adjusters to handle those double-width policies,

20   single adjuster, whatever you want to refer to them

21   at, involving both liability claims and UM claims

22   under the same policy; true?

23        A    Correct.

24        Q    And just for further clarification, those

25   claims that I'm talking about would arise out of the

1    same accident, same policy?

2        A    I'm sorry.  Could you rephrase the

3    question?

4        Q    Sure.

5        A    Could you restate your question?

6        Q    I muddled that up real good for us, so --

7    in the late '90s, you might encounter a situation

8    where a State Farm insured causes a collision with a

9    State Farm insured that has uninsured motorist

10   benefits, and in that late '90s time period, a

11   single adjuster would handle claims made against the

12   liability policy of the alleged tortfeasor as well

13   as first-party claims made by the claimant under

14   their own UM policy; right?

15       A    Correct.

16       Q    Okay.  Now, at some point after the late

17   '90s, State Farm deviated from that practice of

18   having a single adjuster handle both of those

19   claims; correct?

20            MR. ACQUAVIVA:  Object to the form of the

21   question.

22            THE WITNESS:  Yes.  At some point, we

23   started first-party UIM teams.

24   BY MR. ROWE:

25       Q    And those first-party UIM teams would have

1  been tasked with handling exclusively first-party

2  UIM claims; right?

3      A    Correct.

4      Q    Why did State Farm make that change to a

5  first-party UM team?

6          MR. ACQUAVIVA:  Object to the form of the

7  question.  You're asking a global question of why

8  State Farm did something.  Just to be clear, he can

9  testify as to his own personal knowledge as a fact

10  witness, not a company representative.

11          MR. ROWE:  Good clarification.

12  BY MR. ROWE:

13      Q    If you know, why did State Farm make that

14  change?

15      A    I do not know.

16      Q    Do you know when that change was made?

17      A    Not off the top of my head.

18      Q    There is a point in time sometime after

19  the late '90s or in the late '90s when State Farm

20  creates a first-party UM team, and at that point,

21  were UM claims taken from existing adjusters and

22  handled exclusively by that first-party UM team?

23      A    I don't recall, quite honestly.  I mean,

24  people were moving all around to new roles, and, you

25  know, some people had elected to, you know, retire,

```
 1        A    At some point, yes, that is correct.

 2        Q    And at some point after the creation of

 3   that first-party UM team structure, State Farm began

 4   allowing a single adjuster to handle both liability

 5   and UM claims simultaneously; correct?

 6        A    That is correct.

 7        Q    And in those claims, at the time of

 8   Ms. Mason's claims, would have been referred to in a

 9   claim file or a claim note as a "DW" or "double

10   width"; correct?

11        A    Her claim would have been referred to as a

12   "double width," but there's also other, like,

13   double-width files, like, I believe, Mr. Richardson,

14   who owned the car, we identified his claim as a

15   double width, so that's a little bit broader term

16   than what you define there, so...

17        Q    And that's super valuable information.  So

18   "double width" is not exclusively used to determine

19   a liability UM claim?  It could be a collision, med

20   pay -- any two claims might be a double width?

21        A    That's correct.

22        Q    Thank you.

23             Approximately when, if you remember, did

24   State Farm move away from the first-party UM team

25   into a situation where they were, again, allowing a
```

1    **single adjuster to handle liability and UM claims**

2    **arising out of the same collision?**

3         A    To the best of my recollection -- and

4    here, again, I'm getting a little bit older as I get

5    up there -- I think it was around maybe 2015.

6    I'm not exactly sure.  That's the best of my

7    recollection.  About two years before I moved to

8    Texas.

9         Q    I gotcha.

10             And is that after injury claim central was

11    started?

12         A    Yes.  Injury claim central was started in

13    2000.

14         Q    Okay.  And at that point, you had been a

15    claims manager for -- or a claims superintendent for

16    a dozen or more years; right?

17         A    I had been in a leadership position.  You

18    said "claim manager."  That's not the title I had.

19    That was my boss's boss's title, but a team manager

20    or a superintendent, yes, for several years.

21         Q    As an employee who had long tenured been

22    in State Farm leadership handling Oklahoma claims,

23    were you provided any reasoning or basis for the

24    change from first-party UM structure away from that

25    structure?



 1   approximate guess.

 2   BY MR. ROWE:

 3       Q     Approximately 20 to 30 team managers that

 4   would have been handling Oklahoma auto claims?

 5       A     Yes.  When we went to the demand pool

 6   structure.

 7       Q     How many of those would have been handling

 8   claims involving uninsured motorist benefits made

 9   under Oklahoma policies?

10       A     At that time, all of us were.

11       Q     Okay.  How was the transition away from

12   the first-party UM teams communicated to the 20 or

13   30 leadership employees?

14       A     I'm not sure I understand your question.

15   Could you -- could you restate it?

16       Q     Yeah, you bet.

17             So at some point prior to 2015, State Farm

18   had instituted first-party UM teams; right?

19       A     Yes.

20       Q     And by the time 2015 gets here, we've got

21   20 to 30 team managers, leadership employees, that

22   are responsible for overseeing the handling of

23   Oklahoma UM claims; right?

24       A     Yes.

25       Q     And it would seem to me that if the UM

1        A    Correct.

2        Q    Presuming that there's actually a

3    legitimate claim there and that the State Farm

4    insured was negligent and did cause injuries; right?

5        A    Yeah.   There's a lot of things packed into

6    that, but, as a general statement, that is correct,

7    yeah.

8        Q    Now, in a UM claim, or a claim for

9    benefits under a UM policy, the obligation is to

10    determine whether or not the State Farm insured --

11    let me back up a little bit.

12             In that UM context, one of the first

13    things that State Farm has to do is make an

14    assessment of whether or not there is actually a UM

15    policy that is applicable at the time of loss;

16    right?

17        A    Yes.   If the policy is in force and has

18    that coverage.

19        Q    And presuming that they're able to

20    determine that there is coverage, the policy is in

21    effect at the time of that loss, they've got to go

22    through a similar analysis as to the liability side.

23    They've got to determine, through a reasonable

24    investigation, whether or not the UM insured has

25    been involved in an automobile accident resulting

1    from somebody else's negligence; right?

2              MR. ACQUAVIVA:  Object to the form of the

3    question.

4              THE WITNESS:  Well, I guess I want to be

5    clear.  Could you repeat the question?

6    BY MR. ROWE:

7         Q    Sure.  When State Farm is handling a UM

8    claim, one of the things they have to do is

9    determine whether or not their UM insured was

10   injured as a result of somebody else's negligence?

11        A    I think there's a lot more to it than

12   that, but they have to determine if they were

13   injured, if there's a policy in force that has the

14   coverage, if that party that is negligent is an

15   uninsured motor vehicle or an underinsured motor

16   vehicle.

17             So there's more to it than that, but, I

18   mean, as a general premise, that's basically

19   correct, but there's more to it than that.

20             Is that clear?

21        Q    And I think that you're answering my

22   question, and I tried to preface it with one of the

23   things -- and, certainly, I wouldn't be able to --

24   if I just asked you what does State Farm do in a UM

25   claim and you were answering, given your decades of

1    experience doing that, I could ask you one question

2    and we would be here all day and you probably

3    wouldn't have enough time to do it; right?  Right?

4         A    Correct.  There's a lot to it, so...

5         Q    Right.  But you told me earlier -- and

6    it's something that I think I personally agree with

7    -- is that one of the jobs an insurance company is

8    doing when they're handling a claim for benefits

9    under an auto policy is trying to figure out what a

10   jury would do if they had the information; right?

11        A    That's one of the elements, correct.

12        Q    And I'm just trying to reduce it down to

13   something a little more easy to understand.

14             If State Farm is handling a UM claim, one

15   of the things that they have to do is go through

16   those elements of negligence and see if their UM

17   insured has a case; right?

18        A    Correct.

19        Q    And that includes conducting a reasonably

20   thorough investigation to determine whether or not

21   somebody else is at fault for a crash; true?

22             MR. ACQUAVIVA:  Object to the form of the

23   question.

24             THE WITNESS:  We would need to conduct an

25   investigation that would be reasonable and

1   appropriate based upon the facts of the accident and

2   the circumstances presented.

3   BY MR. ROWE:

4        Q     Yeah.  One of the things you've got to do

5   is investigate whether or not somebody else is

6   negligent; right?

7              MR. ACQUAVIVA:  Object to the form of the

8   question.

9              THE WITNESS:  That would be one element.

10  BY MR. ROWE:

11       Q     Okay.  And presuming that that

12  investigation concludes that a third-party -- that's

13  not the right terminology.  I'm going to avoid

14  third-party in this conversation.

15             Presuming State Farm, while investigating

16  or handling a UM claim, gathers information that

17  somebody other than their UM insured was negligent

18  in causing an accident, State Farm then, at some

19  point, has to determine whether or not their UM

20  insured is injured; right?

21             MR. ACQUAVIVA:  Object to the form of the

22  question.

23             THE WITNESS:  Okay.  I'm sorry.  Could you

24  repeat the question?  Because I want to make sure I

25  answer it correctly.



1        A     Yes.

2        Q     In the state of Oklahoma, a UM policy

3   that's issued to a State Farm insured can apply if

4   that UM insured is injured in a car crash and the

5   individual responsible doesn't have sufficient

6   liability insurance to cover all of their damages;

7   true?

8               MR. ACQUAVIVA:  Object to the form of the

9   question.

10              THE WITNESS:  That's correct.

11  BY MR. ROWE:

12       Q     That's one circumstance in which UM might

13  apply; right?

14       A     That is one circumstance.

15       Q     And that would be what some people might

16  call an underinsured situation; right?

17       A     Correct.

18       Q     Underinsured motorist.

19              Another situation in which UM might apply

20  would be a situation in which a UM insured is

21  injured by the negligence of an individual that has

22  no insurance whatsoever; true?

23       A     From what you've described, that is a

24  correct statement.

25              MR. ACQUAVIVA:  And, Counsel, just for

1    clarification, the injury or damages you're speaking

2    of are bodily injury, not property injuries?

3            MR. ROWE:  Absolutely.  I -- just on a

4    side note, doesn't Kansas have uninsured property

5    damage?  Isn't that a coverage in Kansas?

6            THE WITNESS:  I don't know.

7            MR. ROWE:  It's totally immaterial in this

8    conversation.

9            MR. ACQUAVIVA:  And just while we're

10   talking about this, you mentioned a UM policy.

11   Technically, I think it's a coverage, not a policy.

12           MR. ROWE:  That's a good pickup, Jay.  I

13   will refer to the UM as a coverage under a policy,

14   not as a UM policy moving forward.

15           And I don't think there's anything for us

16   to clear up.  I think that, when I've said "UM

17   policy" earlier in the deposition, we all understood

18   that to mean UM coverage under a State Farm auto

19   policy.  I didn't have any other intention but that.

20           MR. ACQUAVIVA:  I think that's a fair

21   understanding.

22   BY MR. ROWE:

23       Q    So we've got one situation in which UM

24   would apply being an underinsured situation.  We've

25   got a second situation which UM might apply where we

1    have a pure uninsured motorist.

2              There is a third possible situation, in

3    which a State Farm UM insured is injured as the

4    result of a hit-and-run driver; correct?

5         A    Correct.  Assuming that party remains

6    unknown and they don't find them and they do or do

7    not have coverage, but a pure hit and run, that

8    would be a correct statement.

9         Q    And a pure hit-and-run situation can exist

10    if there is a physical impact and the hit-and-run

11    driver leaves the scene; right?

12        A    Correct.

13        Q    But a hit-and-run driver situation could

14    also exist if there's no vehicle to be able to

15    contact but that another driver causes a crash;

16    true?

17              MR. ACQUAVIVA:  Object to the form of the

18    question.

19              THE WITNESS:  That is a correct statement

20    from Oklahoma law.

21    BY MR. ROWE:

22        Q    And to further clarify that, under

23    Oklahoma law, there's no requirement that there be

24    an impact from a hit and run driver for UM to be

25    applicable; true?

1      A      That is correct.

2      Q      And sometimes those hit and run drivers

3   that don't make an impact are referred to as

4   "phantom drivers"; right?

5      A      I've heard that term used to describe that

6   situation.

7      Q      And if a phantom driver is at fault for a

8   collision in which a State Farm UM insured suffers

9   injury, that is similar to a purely uninsured

10  motorist situation; true?

11     A      If a phantom driver is at fault for a

12  situation, that could be true, yes.

13     Q      Okay.  And I want to talk to you for just

14  a moment about the idea of a reasonably thorough

15  investigation conducted on behalf of a State Farm

16  insured.

17            If State Farm has information that a

18  hit-and-run driver might be responsible for a

19  collision, it's responsible -- or its obligation is

20  to conduct an investigation with those facts; true?

21            MR. ACQUAVIVA:  Object to the form of the

22  question.

23            THE WITNESS:  That would be correct.  We

24  would need to conduct an investigation that's

25  reasonable and appropriate for that file.

1    do you tell them, "Well, what's reasonable and

2    appropriate depends on the facts and circumstances"?

3        A    If a new adjuster comes to me -- or an old

4    adjuster comes to me and talks about, you know,

5    "What do we need to do on this file?  What would be

6    reasonable and appropriate?"  You know, we look at

7    the questions we have, what we need to do to answer

8    those questions, and try to resolve the claim.

9        Q    So one of the things that defines a

10   reasonable and appropriate investigation would be

11   trying to find the answers to the questions that we

12   have; right?

13       A    Yes.

14       Q    And at a very high level, some of those

15   questions might be:  "Who are the possible negligent

16   parties?"  Correct?

17       A    At a very high level, correct.

18       Q    "Where can we find them?"  Correct?

19       A    I'm sorry.  I didn't quite hear you.

20       Q    Where can we find the negligent parties?

21       A    You mean, like, physically find them or --

22       Q    "Who are they?"

23       A    Who are they.  Yes.

24       Q    "Do they have insurance?"

25       A    Yes.

1        Q    "What are the liability limits of those

2    insurance policies, if they exist?"

3        A    Yes.

4        Q    "Is our insured injured in some way?"

5        A    Yes.

6        Q    "Are there other parties that are injured

7    in some way?"

8        A    Yes.

9        Q    Any reasonably -- or reasonable and

10    appropriate investigation would look for the answers

11    to those questions?

12        A    Yes.

13        Q    And using the answers to those

14    questions -- well, I guess I'll just ask it like

15    this:  If a State Farm adjuster is satisfied that

16    they have conducted a reasonable and appropriate

17    investigation and gathered facts, what do they do

18    with all those facts?

19            MR. ACQUAVIVA:  Object to the form of the

20    question.

21            THE WITNESS:  That's a very -- it's a very

22    broad question, what do we do with all the facts,

23    what is the current status of the file.  Is this day

24    one where we're trying to establish liability and

25    get the car set up and towed and moved and repairs

1    Q    You expect them to seek answers to the

2    questions that they have?

3    A    That would be correct.

4    Q    Okay.  Now, Mr. Harmon, you looked at some

5    documents to prepare for today.  I looked at some

6    documents to prepare for today.  I would imagine

7    Mr. Acquaviva looked at some documents to prepare

8    for today.

9         I'd like to look at some documents, but

10   before we look at those, it seems like we've got at

11   least three State Farm policies that are implicated

12   in the crash between Ms. Mason and Ms. Harrison;

13   right?

14   A    That's correct.

15   Q    We've got Ms. Harrison who has a

16   liability -- or who has liability coverage under a

17   State Farm policy; right?

18   A    Correct.

19   Q    We have Ms. Mason who has a State Farm --

20   A    Can I stop you right quick?

21   Q    Absolutely.

22   A    I think there's four policies, because

23   there's a PLUG policy, so I want to be accurate with

24   that statement.  I hate to back up a question or

25   two, but I think there's really four policies that

 1    field that should have been a little check box

 2    that's clicked.  Apparently, it was not clicked.

 3         Q    This information is inaccurate; correct?

 4         A    That's correct.

 5         Q    Ms. Mason was represented by Andrew Gass;

 6    true?

 7         A    Correct.

 8         Q    Below, we've got some information related

 9    to the policy.  Mrs. Mason had a $25,000 UM policy;

10    correct?

11         A    Correct.  Per person.

12         Q    The liability policy that was applicable

13    to the collision that injured her had a limit of

14    $250,000; correct?

15         A    Correct.

16         Q    Injury codes are on page 2 of this

17    document?

18         A    Correct.

19         Q    This would have been information submitted

20    to State Farm and entered prior to this that would

21    have auto-populated this field; right?

22         A    That's part -- that's accurate, yes.

23         Q    We go into "Injury Description:  Cervical

24    disc disorder."  These are all of the known injuries

25    to State Farm claimed by Ms. Mason; true?

1  for Ms. Mason's injuries?

2              MR. ACQUAVIVA:  Object to the form of the

3  question.

4              THE WITNESS:  I wasn't involved at that

5  point after the allegation was made by Mr. Gass.  I

6  assume that's the question you're asking me.

7  BY MR. ROWE:

8      Q    If the answer is, "I don't know because I

9  wasn't involved," I mean, then that's sufficient.

10     A    I don't know because I wasn't involved.

11     Q    There's no dispute in the claim file that

12 Mrs. Mason has no liability for the collision; true?

13     A    I agree with that.

14     Q    She is zero at fault?

15     A    I agree.

16     Q    If a phantom driver was one percent at

17 fault and Ms. Harrison was 99 percent at fault,

18 State Farm would be required under the terms of the

19 UM policy issued to Ms. Mason to pay benefits; true?

20     A    If your scenario was found to be in fact

21 true, yes, you're correct.

22     Q    And at this point, State Farm has paid no

23 UM benefits to Ms. Mason?

24     A    I'm not involved in that file --

25             MR. ACQUAVIVA:  Object.  I just couldn't

1    because Ms. Mason's damages were within the

2    liability limits of Ms. Harrison's policy; true?

3         A    That's correct.

4         Q    Suit was filed much, much farther out.

5    That was a terrible question, but...

6         A    Yes.  That's my understanding, correct.

7         Q    Ms. Mason filed suit against Ms. Harrison

8    long after that letter was mailed by Ms. Behara?

9         A    Yes.

10        Q    State Farm never took a recorded statement

11   of Ms. Mason on either the liability claim or on the

12   UM claim that she made; true?

13        A    Correct.

14        Q    But at the time that State Farm began

15   investigating in earnest either of those claims,

16   Mr. Mason was represented by Ms. Gass; true?

17        A    Correct.

18        Q    Ms. Mason under the terms of her State

19   Farm automobile policy, when making a UM claim, has

20   an obligation to cooperate in any investigation

21   matters that are reasonable as requested by State

22   Farm; true?

23        A    Correct.

24        Q    State Farm never asked Mr. Gass to take a

25   direct statement from Ms. Mason; correct?

 1       A    Correct.

 2       Q    Likewise, State Farm never took a recorded

 3   statement of Mrs. Harrison; true?

 4       A    We spoke to Ms. Harrison.  We did not

 5   record the conversation, but we spoke to her

 6   throughout the file, as we've talked about today.

 7       Q    As part of that duty to cooperate under a

 8   State Farm policy, Ms. Harrison likewise has a duty

 9   to cooperate in the investigation of liability

10   claims made against her; true?

11       A    Correct.

12       Q    And whether it's Mrs. Mason making a UM

13   claim or Ms. Harrison participating in a liability

14   claim, State Farm also has the ability to compel

15   either of those insureds to offer testimony under

16   oath in an Examination Under Oath; correct?

17       A    Correct.

18            MR. ACQUAVIVA:  Object to the form.

19   BY MR. ROWE:

20       Q    State Farm never took an Examination Under

21   Oath of either Mrs. Mason or Mrs. Harrison; true?

22       A    You're using the term "Examination Under

23   Oath."  They both gave depositions, but, no, they

24   did not give an Examination Under Oath.  So I think

25   that's a legal term that I want to make sure I'm