```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4    LYNNETTE MASON,

5        Plaintiff,

6    vs.                              No. CIV-2020-1217-D

7    STATE FARM MUTUAL AUTOMOBILE
     INSURANCE CO., d/b/a STATE FARM
8    INSURANCE CO., a Foreign
     For-Profit Entity,
9
         Defendant.
10

11

12       VIRTUAL VIDEO DEPOSITION OF BRETT TYNER

13           Taken on Behalf of the Plaintiff

14       On June 16, 2022, beginning at 9:22 a.m.

15       All Parties Appearing Remotely Via Zoom

16

17                  APPEARANCES:

18   Appearing on behalf of the PLAINTIFF

19           Simone Fulmer Gaus
             Andrea Rust
20           Madison Botizan
             FULMER SILL
21           1101 N. Broadway
             Suite 102
22           Oklahoma City, Oklahoma 73103
             405-510-0077
23           Sfulmer@fulmersill.com

24

25   (Appearances continued on next page)
```

1    speed this up.  I said "maybe."

2        A    I --

3        Q    Moving on.

4        A    I agree.  I'm simply restating it to make

5    sure that I am fully answering your question.

6    Please bear with me.  I'll do my best to do that,

7    but because your questions sometimes include terms

8    that are a bit confusing to me, I try to clarify it

9    the best I can by restating portions of the

10   question.

11       Q    Well, if you don't understand my question,

12   please ask.

13            We talked about the uninsured situation.

14   We have another situation that we call underinsured;

15   correct?

16       A    We do.  I think we've spoken about that,

17   yes, ma'am.

18       Q    And then the third is where we have this

19   unknown driver; correct?

20       A    The third is where we have this unknown

21   driver.  If you're asking me if there are -- and

22   I've already testified to this -- if there were

23   someone who was liable and that person were unknown,

24   it may be that the uninsured motorist coverage

25   benefits would be in play in a case such as that.

1      Q      Okay.  And in the -- strike that.

2             That unknown driver, in that scenario,

3      there's also a term I have heard called a "phantom

4      driver."  Have you heard that term?

5      A      Not only have I heard it, but I've seen it

6      written in this case.  The "phantom" being the one

7      that isn't identified.  Yes, ma'am, I have seen that

8      term.

9      Q      And you have seen it before this case,

10     haven't you?

11     A      Yes.  I've seen it and heard it, but, most

12     recently, specifically related to this claim.

13     Q      So can you tell me what the purpose of UM

14     coverage is, no matter which scenario might trigger

15     the need for payment?

16     A      The -- I think -- I think the best answer

17     I have to that is that it pays damages that are

18     contemplated according to the terms of the policy

19     specific to uninsured motorist coverage.  I can't

20     say it any better than the insuring agreement does

21     in the policy.

22     Q      I have taken depositions of State Farm

23     claims employees in the past and I have been told

24     that the purpose of UM is to make the insured whole

25     up to the policy limit.  Have you heard that before?

```
 1   set, I can -- I can answer the questions as it

 2   relates to that.  If you're asking me general

 3   questions, please know that someone could be held

 4   liable for a loss and be making a claim under the

 5   terms of the same policy for uninsured motorist

 6   coverage.  That -- that, I have seen play out in

 7   Oklahoma claim files regularly.

 8        Q    If someone is making a claim for liability

 9   coverage, they are not making a claim for that

10   coverage as a liability insured; correct?

11        A    I'm so sorry.  You would have to give me

12   the facts and circumstances of the case and then I

13   could answer that more -- more clearly.

14             But an insured seeking liability coverage

15   under a policy could be seeking uninsured motorist

16   coverage under the same policy as an insured

17   entitled to contract benefits.  If that's the

18   question, that's my best effort to answer it.

19        Q    And that's not my question at all, sir.

20             There is liability coverage and there is

21   UM coverage; correct?

22        A    That is correct.  Those two coverages

23   exist, yes, ma'am.

24        Q    If someone is injured in a car wreck and

25   they claim it is caused by someone else, liability
```



1    **coverage and UM coverage may both be triggered**

2    **whether they're an insured under that policy or not;**

3    **correct?**

4       A    Both coverages could be triggered,

5    depending on the facts and circumstances of a claim.

6    That is true.

7       Q    **And if that injured person is making a**

8    **claim under liability coverage, they are not, as an**

9    **insured, claiming the liability coverage should be**

10   **paid to them, are they?  They are a third-party in**

11   **that instance; correct?**

12      A    I'm so sorry, Ms. Fulmer.  I don't

13   understand that question.  You're asking me, as I

14   understand it, is a person asking for benefits under

15   a liability policy asking for payment under the

16   liability coverage?  I simply don't understand that

17   question.

18      Q    **And that's not my question, sir.**

19           **My question is:  If someone is a**

20   **third-party to a liability coverage, they are not**

21   **the insured making a claim; correct?**

22           MR. ACQUAVIVA:  Object to the form of the

23   question.

24           THE WITNESS:  I can't tell you that

25   they're not an insured making a claim.  I've already



1  where we have to first -- where we often do

2  determine coverage and fault.

3      Q    And whether either liability or UM

4  coverage is going to be payable depends on the

5  determination of who is at fault; correct?

6      A    I don't believe that that would be a sole

7  determining factor, but I think that whether or not

8  coverage exists would help us determine whether or

9  not something was payable, and I think fault would

10 help us determine whether or not something was

11 payable, all of it depending on the facts and

12 circumstances of a claim.

13     Q    And, sir, I will again ask you to listen

14 very carefully to my question.  This question

15 pertains to the issue of fault.

16          With regard to liability coverage and UM

17 coverage, in order to determine if either one of

18 those coverages require payment, the issue of fault

19 will need to be determined; correct?

20     A    I don't -- I don't know what you mean by

21 "will need to be determined."  If you're saying that

22 we would investigate a claim for liability in the

23 abstract, I would agree that we do that.  Generally

24 speaking, we would do that in claims that involve

25 liability issues.  And then, beyond that, I can tell

1  you that we would do it specific to the facts and

2  circumstances.

3      Q    What does an adjuster do to determine

4  fault?

5      A    I think, Ms. Fulmer, that that, again, is

6  dependent on the facts and circumstances of a case.

7  I think it's our responsibility to act reasonably

8  and appropriately and to address the claims as they

9  exist, but, generally speaking, I don't have a

10  better answer than that.

11      Q    Mr. Tyner, you have claims adjusters who

12  work -- you supervise; true?

13      A    I do have adjusters who work for me, and I

14  do supervise them, yes, ma'am.

15      Q    If they get a claim that comes in and they

16  ask, "What am I supposed to do?" do you just say

17  that "You have to act reasonably"?

18      A    Generally, Ms. Fulmer, we're dealing with

19  specific facts and circumstances when they ask me

20  the question, and, for that reason, my guidance is

21  specific to those facts and circumstances.  I think

22  that the guidance I give them is reasonable and

23  appropriate.

24      Q    And my original question in this regard

25  is:  What does an adjuster do to determine fault?



1      A   I don't recall seeing a tape-recorded

2  statement.  I do recall seeing several versions that

3  were recorded, versions of loss that were provided

4  by Ms. Harrison, so --

5      **Q   And when you talk --**

6      A   If we're going to talk about recordings,

7  if you'll tell me what type of recording.  That's

8  where we started with the first Notice of Loss, just

9  let me know what kind of recording you're speaking

10  of, because I do see several records that relate to

11  her report of the accident.

12      **Q   Can we agree, Mr. Tyner, that the only way**

13  **that we would really know exactly the words that**

14  **Ms. Harrison said at the time that she is reporting**

15  **the fact of this loss would be if someone had taken**

16  **a tape recording of it?**

17      MR. ACQUAVIVA:  Object to the form of the

18  question.

19      THE WITNESS:  Yeah.  I don't know -- I

20  don't know how -- I don't know how you would know

21  precisely what words she spoke, but a recorded

22  statement would be one means by which you would know

23  precisely what words were spoken.  I can agree with

24  that.

25  BY MS. GAUS:

1       Q    So we've looked at the loss report in

2    17.2.  We're looking here on page 147, and I think

3    we agreed that those are pretty much the same with

4    the exception of one thing about the rear-ended;

5    right?

6       A    Yeah.  And I believe that was the same

7    too, Simone -- and I'm sorry, I don't mean to be

8    that familiar -- Ms. Fulmer.  I think you may have

9    just misread that single word, and then, beyond

10   that, there are other -- there are other sentences

11   there --

12      Q    Yes.  And I --

13      A    That was my testimony.

14      Q    Yes.

15      A    But, essentially, it's the same FOL, Facts

16   of Loss, if you will.

17      Q    Okay.  And just so the record is clear, I

18   did not misread it because I was reading directly

19   from the loss report, which does not have

20   "rear-ended."  Okay?

21      A    And I'm mistaken.  And I can't see both

22   documents, so you are absolutely correct.

23      Q    Okay.  I just -- yeah.  And that's, again,

24   one of the disadvantages of the way we're trying to

25   do this.  But if you will look with me now, sir --

1    and I will represent to you, the next time a note

2    regarding what Ms. Harrison says about the wreck is

3    on page 144 -- or Bates No. 144, and it's an entry

4    on 11/11/2015, and it's this one at 4:47 p.m.

5             Do you see where I am?

6    A    I do see that, yes, ma'am.

7    Q    And if you will look, starting here -- do

8    you see where I am?

9    A    I do see where you are, yes, ma'am.

10   Q    And you're welcome to read the whole note,

11   but the part I'm pointing to is "She indicated

12   another vehicle ahead of V2 slammed on their brakes

13   causing V2 to stop suddenly and V1 rear-ended them.

14   Lyndee stated she was cited for FTC."

15             Did I read that correctly?

16   A    Yes, I believe you did.

17   Q    And "FTC," I have discerned -- and correct

18   me if your understanding is different, let me know,

19   but "FTC" is following too close.  Is that how you

20   understand it?

21   A    Yes.  Yes, ma'am.  Some version of that,

22   yes.

23             MR. ACQUAVIVA:  Ms. Fulmer, I don't think

24   you meant to do this, but you've overlooked the

25   November 10 conversation with Ms. Harrison and went

```
 1   straight to November 11.

 2            MS. GAUS:  Let me back up, then.

 3            MR. ACQUAVIVA:  You will find that on

 4   page 145.

 5            MS. GAUS:  Yes.

 6            MR. ACQUAVIVA:  Continuing on to 146.

 7            MS. GAUS:  Yes.  And the one on 146, I

 8   will just tell you, Jay, the reason I skipped it is

 9   it's not any different, and I can't tell if it's

10   because Ms. Harrison told someone that.

11            MR. ACQUAVIVA:  Well, it does say "Spoke

12   to named insured driver" in the Activity section.

13            MS. GAUS:  Right.  And if you look at what

14   you were just looking at me -- what you were just

15   pointing out, those Facts of Loss mimic the other

16   Facts of Loss.  And we can do it for the record too.

17   BY MS. GAUS:

18       Q    Mr. Tyner, if you'll look at this

19   page 146, and as Mr. Acquaviva pointed out, this is

20   a note from -- I have to go up one -- November 10th,

21   2015, right there.  Do you see that?

22       A    I do see that, yes, ma'am.

23       Q    And it appears to be a note by someone

24   with regard to the medical payment initial contact;

25   correct?
```

1       A    That's what that says, yes, ma'am.

2       Q    And it goes along, and it's a lengthy

3  note, but if you'll look right here where I'm

4  pointing, it's under that red box there, the first

5  red box, and it says "Vehicle damaged/injury

6  mechanism/causation.  Named insured stated she was

7  driving the described car not on the job going home

8  when" -- and then the next part of this says "V1

9  exited on 12th Street and Moore, two cars in front

10  of V1.  One vehicle made a left into a neighborhood.

11  The car behind the other locked brakes and V1

12  rear-ended V2."

13           Did I read that correctly?

14      A    I believe you did, yes, ma'am.

15      Q    If we're looking here where the caps start

16  on "V1 exited on 12th Street and Moore," do you see

17  where I am?

18      A    I do see that, yes, ma'am.

19      Q    If we go back to the note we were just

20  reading from November 6th, the same language appears

21  there in cap, does it not?

22      A    I see that, and that is generally the same

23  language, or exactly the same.

24      Q    Okay.  So this here, is it fair to say

25  this would have been populated by something that was

1    **already in the system about the Facts of Loss?**

2        A    No.  That appears to be a second contact,

3    in this case, possibly a -- would be a second

4    contact in a third entry with respect to facts

5    provided by Harrison.  When the medical payments

6    coverage folks reach out and they enter a contact,

7    they are, again, it's my understanding, confirming

8    the facts of the accident -- not restating them, but

9    they have their own investigation with respect to

10   the items and issues that are raised in that file

11   note.

12       **Q    So even though these Facts of Loss read**

13   **identically, is it your testimony that Ms. Harrison**

14   **would have said it exactly the same way both times,**

15   **as she talked to Mr. Blair as when she talked to the**

16   **maker of this note, Devon Hale?**

17       A    I can't testify -- and I mentioned this

18   before.  I can't testify as to what occurred during

19   these interactions.  What I can tell you is only

20   what I see.  This appears to be a separate contact.

21   It appears to be a separate entry with respect to

22   confirming the facts of the accident and the other

23   items that are listed.  To the extent that those are

24   similar or were shared similarly with the handler,

25   they may have been, in part, copied from one

```
 1   location to another, but I don't -- I simply don't
 2   know.  I don't -- I don't know what I don't know.
 3       Q    Right.
 4            And if we go back to the November 6th
 5   note, do you see this typo on the word
 6   "neighborhood"?
 7       A    Uh-huh.
 8       Q    The same typo is in this note from
 9   November 11th too.  Do you see it?
10       A    I do.  I believe you.  I'm not suggesting
11   that they didn't enter the facts in one way or
12   another way, but I haven't concluded that a contact
13   wasn't made to confirm those facts.
14       Q    Okay.
15       A    That's all I was saying.
16       Q    So if we go to Bates No. 144, unless
17   Mr. Acquaviva tells me otherwise, I believe this one
18   here that we were working on, on November 11, 2016,
19   at 4:47 p.m., appears to be a contact that someone
20   by the name of Kevin Fields had made with
21   Ms. Harrison.  Is that fair?
22       A    I believe so, yes, ma'am.
23       Q    And in Mr. Fields' notes, again, he puts
24   in a summary of what he and Ms. Harrison talked
25   about with regard to the Facts of Loss.  Is that
```

 1   **fair?**

 2       A     I think that's a fair statement.  He is

 3   making a contact and entering that information, yes.

 4       **Q     And this information says "She indicated**

 5   **another vehicle ahead of vehicle 2 slammed on their**

 6   **brakes causing V2 to stop suddenly and V1 rear-end**

 7   **them."**

 8           **This note is a little bit different than**

 9   **those first notes we looked at, isn't it?**

10       A     That appears to be a new version that's

11   been introduced to the claim file.  I do see that,

12   yes.

13       **Q     And what's missing from this note is this**

14   **about a third vehicle turning left in front of**

15   **Ms. Mason; true?**

16       A     Are you asking me if that's the

17   difference?

18       **Q     Yes, sir.**

19       A     That appears to be a difference.

20       **Q     Is there any other difference between this**

21   **statement and the other ones?**

22       A     I don't know without looking at the

23   documents and comparing one line to the other, but I

24   will say that that seems to be the fundamental

25   difference in the facts that are secured from

```
 1        Q    And following this note on page 144, if I
 2   can find it.  Right here.  There's a note on
 3   11/11/2015 by Mona Tillette.
 4              Do you see that?
 5        A    Yes, ma'am.
 6        Q    And it says, "pends named insured Facts of
 7   Loss.  Did I interpret that correctly?
 8        A    Yes, ma'am.
 9        Q    And it says, "Know what caused other
10   vehicle to slam on their brakes."
11              Do you see that?
12        A    I see that note, yes, ma'am.
13        Q    Do you know if anyone ever answered that
14   question?
15        A    I -- I'm so sorry.  Tell me -- the issue
16   was addressed in multiple versions of the accident
17   provided by Ms. Harrison.  Was it another vehicle --
18   did she do it on her own for no reason?  I don't
19   know that that question was answered.
20              I know that the question of liability was
21   answered generally, and I know how that was decided
22   with respect to the facts specific to this loss
23   based on all of the information that was available.
24        Q    And focused in on this period of time,
25   long before litigation comes around, someone at
```

1    Q    Okay.  In your note here -- I'll give you

2    a chance to go ahead and read that.  I'm just going

3    to ask you a couple of questions about it.

4    A    Sure.  Can you make that just a bit

5    larger?

6    Q    Of course.

7    A    I'm so sorry.  I'm just having a hard time

8    reading it.

9    Q    No.  It is difficult, and I apologize for

10   that?

11   A    Yes, ma'am, I've read that.

12   Q    And I'm going to go back one page from

13   this note on page 47, which we established was

14   written on June 29th, 2020, to a note written on

15   July 5th, 2020.

16        Do you see where I am?

17   A    Yes, I do.

18   Q    And I'll give you a chance to go ahead and

19   read that note?

20   A    I see that.

21   Q    Okay.  In reading those notes, I'm going

22   to pull this down for a minute so I can see you.

23        In reading those notes, do they refresh

24   your memory of what you did to -- what you reviewed

25   in order to respond to Mr. Gass's letter asking for

1   **UM benefits?**

2        A     That does help refresh my memory, yes,

3   ma'am.

4        **Q     Okay.  And what did you review?**

5        A     I reviewed the documents that are listed

6   in the notes that I made, and as I've testified to

7   previously, I reviewed portions of the files,

8   particularly as it related to the assessment of

9   liability.

10            In this case, I'm trying to determine if

11   there is persuasive evidence that Ms. Mason is

12   eligible for uninsured motorist coverage due to the

13   negligence, in this case, of a phantom vehicle.  I

14   knew she wasn't eligible for an underinsured

15   motorist payment by virtue of the judgment.

16        **Q     And with regard to your assessment as to**

17   **the phantom vehicle, if the liability assessment**

18   **itself revealed that there was even one percent**

19   **negligence on the part of the phantom vehicle, would**

20   **that have triggered some payment under Ms. Mason's**

21   **UM coverage?**

22        A     I -- Ms. Fulmer, I don't know what might

23   have happened or what could have happened in the

24   loss, but when I reviewed this claim, when I

25   actually reviewed the claim, what I understood was

```
 1        A    I'm sorry.  You'll have to ask that

 2   question again.

 3        Q    Thank you.

 4             In order for you to place a hundred

 5   percent liability on Ms. Harrison, you have to

 6   disbelieve that there was a phantom vehicle, as she

 7   described?

 8        A    What I had to do was evaluate the evidence

 9   that I had, and I've testified to that.  It isn't --

10   it isn't that I'm calling Ms. Harrison a liar.  It

11   isn't that I don't believe that she may have

12   misremembered the way the accident happened two or

13   three times.  That, I will leave for somebody else.

14   What I'm charged with doing is evaluating the

15   evidence and then making a reasonable conclusion

16   based on the evidence.

17        Q    With regard to the evidence that you

18   reviewed, the notes we just looked at indicate you

19   looked at some of the materials as they were

20   available on OSCN; true?

21        A    I can tell you I did look at the materials

22   that were on OSCN, and one of the documents wasn't

23   there, and I had to review it in summary, but I

24   can't recall which was which at the moment.

25        Q    Okay.  Would your note refresh your memory
```

1    on that?

2        A    It might.  It might.  I don't know that

3    I -- I may have commented about the one that I

4    couldn't see but had to surmise.  I just -- I'm not

5    sure.

6        Q    I'm looking at Exhibit 2.1, SF46.  There's

7    a note here "July 5th."

8             Do you see where I am?

9        A    I do, yes, ma'am.

10        Q    Does this refresh your memory about what

11    you had to get a summary of?

12        A    Yes, ma'am.

13        Q    And what was that?

14        A    It says I reviewed copies of the pretrial

15    conference order jury instructions from Ms. Mason's

16    suit.  Also confirmed a pink verdict form.  That is

17    the form that I wasn't able to view, but it was

18    referenced on the OSCN site, apparently, that there

19    was a pink verdict form returned by the jury

20    consistent with Instruction No. 20.

21        Q    Did you review all of the jury

22    instructions?

23        A    I can't recall what portions of them I

24    reviewed.  I believe I did review all of the jury

25    instructions, but as I sit here today, two years

1    later, I'm simply not certain.  Didn't commit that

2    to memory.  I'm sorry.

3        **Q    Is it your understanding of the manner in**

4    **which a jury is instructed in the state of Oklahoma**

5    **that the jury instructions are supposed to be**

6    **considered as a whole?**

7        A    I'm not an attorney.  It's my

8    understanding that all of the jury instructions that

9    are provided are to be considered.

10       **Q    Okay.**

11       A    I don't know if you mean as a whole -- I

12   don't know what that means "as a whole," but I

13   believe all of them are to be considered.

14       **Q    Do you recall if you reviewed all of the**

15   **jury instructions?**

16       A    I answered that to tell you I'm not

17   certain if I reviewed all of the jury instructions

18   or not.  I may well have done that.  I simply can't

19   recall from two years ago every line that I reviewed

20   from the jury instruction.

21            (Exhibit 3.4 marked for identification)

22   BY MS. GAUS:

23       **Q    Thank you.**

24            **I'm going to now share with you**

25   **Exhibit 3.4.  Mr. Tyner, can you see the exhibit**

1    that I've put up?

2         A    Yes, ma'am.

3         Q    And I will represent to you that this is

4    Exhibit 3.4, Bates No. SF192 through 194.  Can you

5    identify this letter for me?

6         A    I can.  It's a letter drafted by Jonah

7    Kennedy in response to Mr. Gass's most recent --

8    most recent letter.

9         Q    Is it your testimony that Mr. Kennedy

10   drafted this letter?

11        A    He drafted it, yes, and I assisted him

12   with, not only the verbiage, but also review of the

13   documents, on how to access them on OSCN, review of

14   the documents, and then the verbiage that was used.

15   But he's the one who drafted it, wrote it, and I

16   believe mailed -- at least caused it to be mailed.

17        Q    So is it your testimony that Mr. Kennedy

18   reviewed the court's pretrial conference order,

19   Court's jury instructions and the Court's journal

20   entry of judgment as reflected in this first

21   paragraph here?

22        A    I believe that I reviewed those with

23   Jonah.  Part of his early training with me was how

24   do I get into OSCN?  How do I find the statutes?

25   How do I find documents?

1    did not, which is why I did not record it.

2            And one other thing.  It was -- it was my

3    asking Mike.  I said, "Look, we believed that

4    Harrison was liable for the case," that that was

5    the -- the V2D rear-ending V1 reference, that was

6    based on my review of the issues of liability.

7            And I was also reviewing it in light of

8    Mr. Gass's statement in his letter that the verdict

9    form said something that I simply couldn't identify.

10   I couldn't identify it in what I had looked at up to

11   that point, so I called Mike to say, "Hey, what

12   happened?"  And I'm telling you, Mike said, "I don't

13   know.  I simply don't know."

14        Q    **It's true, is it not, that this verdict**

15   **being a zero verdict was a surprise to the folks at**

16   **State Farm?**

17        A    I -- I can't tell you what their reaction

18   to it was.  It's surprising to me as I look back on

19   it now, that Ms. Harrison rear-ended the vehicle and

20   that that seems relatively clear, but why the -- why

21   the jury ruled as it did, I simply don't know.

22        Q    **Did Mr. Chitwood provide any content for**

23   **the letter that you wrote or that was written back**

24   **to him?**

25        A    No.  No, ma'am.  He did not.  We had a

1   very brief conversation, and I said, "Essentially,

2   Mike, what happened here?  Am I missing something?

3   Because the allegation that I have in front of me is

4   that a phantom vehicle was deemed responsible for

5   this occurrence?"  And he said, "I don't -- I don't

6   know."

7            But, no, I didn't talk to Mike.  He wasn't

8   counsel for State Farm.  He was counsel for

9   Ms. Harrison, so I would not have spoken to Mike to

10  ask him how to respond to the letter on behalf of

11  State Farm.

12       Q    Did Mr. Chitwood tell you that one of the

13  defenses at trial was the phantom vehicle?

14       A    I don't recall his having told me that

15  that was one of the defenses.  I do recall him

16  saying "I don't know why it came back the way it

17  did."  And then, from there, I went to seek

18  additional information to tell me what the jury was

19  supposed to do.

20       Q    Did you ask Mr. Chitwood about the -- I'm

21  sorry.  Strike that.

22            Did you go back and review what

23  Ms. Harrison testified to at trial?

24       A    I've already testified to the fact that I

25  did not see her statement -- I'm sorry, her

1    testimony from the trial.  I knew --

2        **Q    Or her deposition?**

3        A    I'm sorry?  Say again.

4        **Q    I'm sorry.  There were two times she said**

5   **this.  We talked about her deposition earlier and**

6   **you said you hadn't looked at her deposition, and**

7   **now I'm asking a different question, which is, if**

8   **you looked at the testimony at trial, which I**

9   **believe you're telling me you did not.  Is that**

10  **fair?**

11       A    I don't believe I went back to review the

12  trial transcripts.  In fact, I'm certain I did not

13  go into the trial transcripts.

14      **Q    Did Mr. Chitwood tell you that during**

15  **opening statement, defense counsel argued that**

16  **Ms. Harrison was not at fault for the wreck due to**

17  **the phantom vehicle?**

18       A    He wouldn't -- he wouldn't have told me

19  that then.  I've described to you my recollection of

20  the content of my discussion with Mike Chitwood, and

21  that is virtually complete.  I called Mike to say

22  "What happened?  Mr. Gass claims that there was a

23  ruling by the jury that a phantom vehicle caused the

24  accident."  And Mike said, "I don't know -- I don't

25  know what happened."  But he didn't tell me opening

1    Q    Did you have some doubt in your mind that

2    Mr. Gass was making an uninsured motorist claim

3    based in part on the phantom vehicle?

4    A    I can go back and read the letter with

5    you.  I believe I had a good grasp on his client's

6    testimony, and when you say "based on" -- your

7    question is:  Was Mr. Gass's claim based on a

8    phantom vehicle?  I don't -- I don't know what that

9    means, but I know that he wouldn't say that the

10   phantom was liable, that his client was legally

11   entitled to collect money from a phantom.

12        What he elected to say was:  The jury

13   decided that a phantom vehicle was liable.  I

14   believe I'm stating that generally correctly, but we

15   might need to go back to the letter to review it.

16   Q    Does the letter to Mr. Gass explain how

17   State Farm came up with its liability determination?

18   A    Mr. Gass's letter didn't ask anything

19   about how State Farm came up with a liability

20   determination.  The response was directed at the

21   letter that was received in June of 2020.  It

22   wouldn't -- I didn't raise every single issue in the

23   claim.  At that point, what I did is I responded to

24   Mr. Gass's letter.

25        What I did beyond that was go back and try