```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF OKLAHOMA

 3    LYNNETTE MASON,
            Plaintiff,
 4
      vs.                                   No. CIV-2020-1217-D
 5
      STATE FARM MUTUAL
 6    AUTOMOBILE INSURANCE
      CO., d/b/a STATE FARM INSURANCE
 7    CO., a Foreign For-Profit
      Entity,
 8          Defendants.

 9

10          VIDEOTAPED DEPOSITION OF SHELLI BEHARA
               TAKEN ON BEHALF OF THE PLAINTIFF
11         ON JUNE 7, 2022, BEGINNING AT 9:55 A.M.
                    IN TULSA, OKLAHOMA
12

13                      APPEARANCES:

14    Appearing on behalf of the PLAINTIFF:

15    Simone Fulmer
      Andrea Rust
16    THE FULMER GROUP
      1101 North Broadway, Suite 102
17    Oklahoma City, Oklahoma 73103
      (405) 510-0077
18    sfulmer@fulmergrouplaw.com

19    Appearing on behalf of the DEFENDANT:

20    Joseph T. Acquaviva, Jr.
      Wilson, Cain & Acquaviva
21    300 Northwest 13th Street, Suite 100
      Oklahoma City, Oklahoma  73103
22    (405) 236-2600
      jtaqua@sbcglobal.net
23

24    VIDEOTAPED BY:  Gabriel Pack

25    REPORTED BY:  Lacy Antle, CSR, RPR
```

1    Q    (BY MS. FULMER) Ms. Behara, we just took a
2  little lunch break and I was able to swap out
3  Exhibit 4.1.  Do you see that document in front of
4  you?
5         (Exhibit 4.1 marked for identification.)
6    A    Yes.
7    Q    And it starts with Bates Number 89, do you
8  see that, Harrison 89?
9    A    Yes.
10   Q    And it ends on Bates Number 148, is that
11 what you have there?
12   A    Yes.
13   Q    Now, because you have told me that you've
14 not gone back and looked at these claim notes, I
15 want to ask some questions about the claim itself.
16 Would it be helpful for you to take some time off
17 the record and read this?
18   A    I'd be willing to look at them.
19   Q    Okay.  And my hope is that if there's
20 something that might refresh your memory from it, it
21 will be easier for you and me to have a discourse
22 about it, if you've actually looked at it and
23 already had your memory freshed, is that all right?
24   A    Okay.
25   Q    I also would like for you to look at 2.1,

1  which was -- first off, can you tell by looking at
2  4.1 that is that -- the one in your hand.
3      A    Oh, yes.  I'm sorry.
4      Q    That that is the liability claim notes?
5      A    I can't.
6      Q    If you will look there on kind of the
7  second set, second box, where it says, "Basic Claim
8  Information."
9      A    Okay.
10     Q    And it says, "Named Insured:  Lyndee
11 Harrison."  Do you see that?
12     A    Yes.
13     Q    Do you have an understanding of who Lyndee
14 Harrison is?
15     A    From the -- reading the trial testimony,
16 she would be the defendant.
17     Q    And she was an insured of State Farm,
18 true?
19     A    Correct.
20     Q    And this -- these claim notes are with
21 regard to a claim made under her liability coverage,
22 is that how you read that?
23     A    Correct.
24     Q    So 4.1, is it fair to say, are the
25 liability claim notes?

1  **documentation of a claim so that someone could go**
2  **back and recreate what happened on the claim?**
3           A    My understanding is that a person should
4  be able to review the claim to determine what's been
5  done and to review what issues still need to be
6  resolved.
7           Q    And you've been taught and in fact up
8  **until today you're still handling claims, you**
9  **understand that pertinent events on the claim need**
10 **to be able to be recreated from the documentation**
11 **that you're keeping on that claim, true?**
12          A    I am not sure I understand what you mean
13 by "recreated."
14          Q    Someone should be able to look at what --
15 **look at your claim file and be able to tell what's**
16 **happened on that claim?**
17          A    Someone should be able to review the claim
18 and see what has been completed.
19          Q    And the basis for any decisions you've
20 **made, they need to be documented in that claim file**
21 **as well, true?**
22          A    Decisions should be documented.
23          Q    Not just the decision, but why you made
24 **that decision, true?**
25          A    I think that that would depend.

1  Q  On what?
2  A  On the information that's -- that has been
3  gathered, if it's the same information, yeah, I
4  don't -- I'm sorry, it's been so long.
5  Q  Well, I'm asking you questions about
6  things that you still do today.  You make decisions
7  on claims; don't you?
8  A  I do.
9  Q  Do you document in your claim file why you
10  make the decision that you do?
11  A  I do.
12  Q  Okay.  Claim files are where one can look
13  and be able to tell why you did what you did, true?
14  A  Yes, I document my files.
15  Q  When you are handling a liability claim
16  and a UM claim arising from the same accident, I
17  should be able to pick up a UM claim file and tell
18  exactly what you did and why you did it with regard
19  to that UM claim, without regard to looking at a
20  liability claim, true?
21      MR. ACQUAVIVA:  Object to form of the
22  question.
23      THE WITNESS:  I don't handle UM anymore, I
24  don't -- I can't -- I don't recall.
25  Q  (BY MS. FULMER) And so you don't recall

1  December 28th, 2016, that tells you its value is not
2  going to exceed the liability limits?
3      A    If I'm looking, reviewing a claim fairly
4  and reviewing, it's the same information.
5      Q    And you mean the information from the
6  liability claim file, is that right?
7      A    I'm sorry, it's been so long.
8      Q    Okay.  Can we agree that the UM claim
9  notes that we have here, your first entry on
10 December 28th, 2016 makes the assertion that the UM
11 claim does not appear to exceed the liability
12 limits?
13     A    That's what the note says.
14     Q    If there were nothing in the UM claim
15 prior to that time to indicate that you had done an
16 evaluation of the UM claim or done an evaluation of
17 anything to do with Ms. Mason's bodily injury, is it
18 fair to assume you would have relied on what you
19 knew from handling the liability claim?
20     A    There's -- it's been too long, I don't
21 think there's enough information here for me to...
22     Q    And I'm trying to refresh your memory to
23 the manner in which you would typically handle
24 claims, not necessarily this claim.  Would it have
25 been your practice, when you're handling both a

1  liability claim and a UM claim arising out of the
2  same wreck, that you would evaluate whether the UM
3  claim exceeded liability claim by what you knew from
4  the liability claim?
5       A    I'm sorry, I don't -- I don't recall, it's
6  been too long.
7       Q    But it's fair to say, in this UM claim
8  note, we don't know what you were considering about
9  the claim itself to lead you to the conclusion that
10 its value did not exceed 250,000, true?
11      A    I don't -- I don't recall.
12           MS. FULMER:  Will you repeat my question,
13 please, Lacy?
14           (Record read as requested.)
15      Q    (BY MS. FULMER) Ms. Behara, you understand
16 that my question is simply about this note right
17 here on December 28th, 2016, does that note tell us
18 what you were considering when you're saying that
19 the UM claim does not appear to exceed the liability
20 limit?
21      A    It tells me that the -- to -- I don't know
22 what it tells me, I'm sorry, it's been too long.
23      Q    But if you and I are looking at these
24 words, they're not telling us what you're relying
25 on, are they?

```
 1        A    It shows me that the liability limits are
 2   250,000.
 3        Q    Right.  And my question is:  The UM claim
 4   not appearing to exceed $250,000, we don't know by
 5   reading this note what information you're relying on
 6   to draw that conclusion, do we?
 7        A    I'm sorry, I don't have an answer for you.
 8        Q    Okay.  Do you know if you had evaluated
 9   the liability claim by that time that you write this
10   December 28, 2016 note?
11        A    Not without going back and looking.
12        Q    I will represent to you that Exhibit 4.2
13   is a copy of the liability evaluation and it was not
14   performed until sometime in August of 2017, which
15   would have been after your claim note here; correct?
16             (Exhibit 4.2 marked for identification.)
17             MR. ACQUAVIVA:  Object to form of the
18   question.
19             THE WITNESS:  What were the dates again?
20        Q    (BY MS. FULMER) Well, your claim note is
21   December 28th of 2016 and the liability claim
22   evaluation didn't take place until sometime in
23   August of 2018, so the note that you wrote on
24   December 28th, 2016 would have been before you
25   actually conducted an evaluation of a liability
```

1  claim; correct?
2         MR. ACQUAVIVA:  Object to form of the
3  question.
4         THE WITNESS:  Based on the dates that
5  you're stating.
6     Q   (BY MS. FULMER) Yes, ma'am.  To help you
7  out, if you'll look on page -- of Exhibit 4.1, page
8  Bates Number 117.
9     A   Okay.
10    Q   And there at the bottom, the next to last
11 entry on August 11th, 2017 at 3:44 p.m., do you see
12 where I am?
13    A   Yes.
14    Q   And this is where Mr. Harmon is noting,
15 "Please see CS Behara's IED for Ms. Mason's injury."
16        Do you see that?
17    A   I do.
18    Q   Do you know what an IED is?
19    A   I don't recall the acronym.
20    Q   If you will look in your notebook behind
21 tab 4.2.
22    A   Okay.  Okay.
23    Q   And can you identify what Exhibit 4.2 is?
24        (Exhibit 4.2 marked for identification.)
25    A   Auto Injury Evaluation.

1  Q   Do you recognize that form?
2  A   It looks familiar.
3  Q   I'll give you a chance to look at it, but
4  my question about it is:  Does this appear to be
5  where you would have evaluated the liability claim?
6  A   I don't recall, it doesn't look the same
7  as what I remember.
8  Q   Does it appear to be a liability -- or a
9  claim evaluation?
10 A   It does.
11 Q   And if you'll look on page 566 of that
12 document, and you see that in the demands and offers
13 history, do you see where I am?
14 A   Yes.
15 Q   It appears that a demand was made of
16 $250,000 on August 8th, 2017, do you see that?
17 A   I do.
18 Q   And it looks like an offer was made on
19 August 21st, 2017.  Do you see where I am?
20 A   Yes.
21 Q   Now, if you look back at Exhibit 4.1 --
22 I'm sorry, 2.1, at the time you made the
23 December 28th, 2016 claim note regarding the value
24 of the claim not exceeding the liability policy, you
25 had not evaluated the U -- the liability claim yet,

1    had you?

2              MR. ACQUAVIVA:  Object to form of the

3    question.

4              THE WITNESS:  My evaluation's still within

5    the policy limits of the liability.

6         Q    (BY MS. FULMER) I understand that, ma'am,

7    but that wasn't my question.  My question is:  As of

8    December 28th, 2016, when you are making the note

9    that the UM claim does not appear to exceed the

10   250,000-dollar liability coverage, you wrote that

11   note before you had evaluated the liability claim,

12   true?

13             MR. ACQUAVIVA:  Object to form of the

14   question.

15             THE WITNESS:  There wasn't enough

16   information there.  Ms. Mason was represented, I...

17        Q    (BY MS. FULMER) In Exhibit 2.1, if you will

18   you can turn, please, to where you -- strike that.

19             When you are making a decision on a UM

20   claim, one of the things you have to determine is

21   who's at fault for the wreck; true?

22        A    Say that again.  I'm sorry.

23        Q    Sure.  When you're making a decision on a

24   UM claim, one of the things you have to determine is

25   who's at fault for that wreck, true?

```
 1       A    I'm to make a liability decision, yes.
 2       Q    And is that liability decision, in a
 3  double width claim like this, is it a liability
 4  decision that's made independent of what's already
 5  been done in a liability file?
 6            MR. ACQUAVIVA:  Object to form of the
 7  question.
 8            THE WITNESS:  As stated previously, I
 9  gathered the testimonies of the witnesses and I
10  reviewed the police report and the greater weight of
11  the evidence is -- determines the liability
12  decision.
13       Q    (BY MS. FULMER) Yes.  And my question was:
14  When you're handling both a liability claim and a UM
15  claim at the same time arising from the same
16  accident, when you are answering the question of
17  liability in the UM claim, are you relying on the
18  same liability decision that had been made in the
19  liability claim?
20       A    I'm gathering the same information.
21       Q    And so in the UM claim, when -- on
22  Ms. Mason's UM claim specifically, when you make
23  reference to liability, is it fair to say you're
24  relying on what you had determined or had been
25  determined in the liability claim?
```

1  A  It's been too long.
2  Q  And was that your typical practice?
3  A  It's been too long.
4  Q  Okay. If you will look, please, at page
5  49, SF49 of Exhibit 2.1.
6     THE VIDEOGRAPHER: Simone, your
7  microphone's covered.
8  Q  (BY MS. FULMER) And on page 49, the entry
9  from December 29th, 2016, do you see where I am?
10 A  Yes.
11 Q  It says, "Category liability and final
12 lead to R/E V1."
13    Do you see where I am?
14 A  Yes.
15 Q  Can you tell me what that means?
16 A  Vehicle 2 rear ended vehicle 1.
17 Q  And do we know who vehicle 2 is?
18 A  There's not information here for me to
19 determine that.
20 Q  And I take it you don't recall what "V1"
21 and "V2" meant from your time at State Farm?
22 A  Correct.
23 Q  Is there any reference in this UM claim of
24 you reviewing any kind of testimony or statement of
25 either of the participants in this wreck?

1    A    It's been so long, I just have to rely on
2    what's here, so...
3    Q    And in fact, that's why claim notes exist,
4    so we can go back and recreate what happened.  Can
5    you tell from this recreation, as we're sitting here
6    today, what statements you might have reviewed to
7    determine on December 29th, 2016, this final V2 R/E
8    V1.
9    A    It's been too long.  I'm sorry.
10    Q    Can you tell from these UM claim notes
11    what the police report said about this wreck?
12    A    I don't recall.
13    Q    Can we tell from your note here where the
14    greater weight of the evidence went in your
15    liability determination?
16    A    That V2 is responsible.
17    Q    And -- but we can't tell from looking at
18    this note what evidence you're actually weighing,
19    true?
20    A    Sorry, I don't recall.
21    Q    Well, I'm asking you, from the note you
22    see there, and you've taken some time to read these
23    UM claim notes, we don't know from those UM claim
24    notes what evidence you're weighing to come to the
25    determination that V2 R/E V1; correct?

```
 1        A    I don't know.
 2        Q    If you will look, please, at Exhibit 4.1
 3   and turn with me to Bates Number Harrison 147.  If
 4   I'm to understand your testimony, in order to
 5   determine who's at fault, it's important that you
 6   gather information about the wreck itself so that
 7   you can make that decision, true?
 8        A    Yes, I gather the -- I gather -- I gather
 9   the available evidence, yes.
10        Q    And you'd agree with me that a police
11   report in and of itself is not the key to your
12   liability decision, is it?
13             MR. ACQUAVIVA:  Object to form of the
14   question.
15             THE WITNESS:  It is one piece of the
16   puzzle.
17        Q    (BY MS. FULMER) And it's important for you
18   as an adjuster to put those pieces together so that
19   you can come up with a fair liability determination;
20   correct?
21        A    I gather all of the information, I review
22   it and I come up with a liability decision, yes.
23        Q    So you've mentioned that a police report
24   is but one piece of that puzzle; correct?
25        A    That is correct.
```

```
 1        Q    Another piece of that puzzle is what the
 2   insured says about what happened; correct?
 3        A    Yes.
 4        Q    Another piece of that puzzle is what the
 5   injured person has to say about that wreck; correct?
 6             MR. ACQUAVIVA:  Object to form of the
 7   question.
 8             THE WITNESS:  Another piece of -- it is
 9   what each party has to say.
10        Q    (BY MS. FULMER) So if I were to restate
11   what I just asked you, it's important that you know
12   what each party has to say about what happened;
13   correct?
14        A    I gather the information from the
15   witnesses, yes.
16        Q    And if you have two vehicles involved in a
17   wreck, both drivers are going to have something to
18   say about what happened in that wreck, assumably
19   that they survive it; correct?
20        A    Correct.
21        Q    And for you to make that -- put that
22   puzzle together, you need all those pieces; correct?
23             MR. ACQUAVIVA:  Object to form of the
24   question.
25             THE WITNESS:  It depends.
```

```
 1        Q    (BY MS. FULMER) What does it depend on?
 2        A    It depends on -- it can depend upon what
 3   -- what the damages show, what the police report
 4   shows, what -- what the greater weight of the
 5   evidence shows.
 6        Q    Okay.  And perhaps I need to restate my
 7   question.  What the damages on the vehicle shows,
 8   what the police report shows, what the various
 9   participants in that wreck say, those are all things
10   that give you a full picture of what happened so
11   that you can apply the greater weight of the
12   evidence to make that liability determination;
13   right?
14        A    Right.
15             MR. ACQUAVIVA:  Object to form.
16        Q    (BY MS. FULMER) On page 147 of Exhibit 4.1,
17   if you will look at the entry made on November 6th,
18   2015 at 1:33 p.m. by Lacrista Medina, are you with
19   me?
20        A    Yes.
21        Q    Do you know who Ms. Medina is?
22        A    I know of her.
23        Q    Do you know what role she played at State
24   Farm?
25        A    She was a claims specialist in the
```