```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
     LYNNETTE MASON,
 3
          Plaintiff,
 4
     vs.                                     No. CIV-2020-1217-D
 5
     STATE FARM MUTUAL AUTOMOBILE
 6   INSURANCE CO., d/b/a STATE
     FARM INSURANCE CO., a Foreign
 7   For-Profit Entity,

 8        Defendant.

 9


10


11


12     VIDEOTAPED DEPOSITION OF GERARD "JERRY" PIGNATO

13            TAKEN ON BEHALF OF THE DEFENDANT

14      ON AUGUST 5, 2022, BEGINNING AT 8:29 A.M.

15               IN OKLAHOMA CITY, OKLAHOMA

16


17


18


19


20


21


22


23


24   VIDEOTAPED BY:  Gabe Pack

25   REPORTED BY:  D. Luke Epps, CSR, RPR
```

Professional Reporters
800.376.1006
www.proreporters.com

**EXHIBIT 9**

1  submitted a draft report?

2      A    Are you talking about the first or the
3  second one?

4      Q    Either.

5      A    Yeah.  No, I don't think this particular
6  subject is discoverable.  I think this is
7  privileged, what changes we've made on our draft
8  reports, but I'll tell you, they were nominal, if
9  any.  For example, on the first one, all I did is
10 get rid of the designations defendant and plaintiff
11 and give specific names to clarify.  It made more
12 sense to have names instead of defendant and
13 plaintiff because there was an underlying lawsuit
14 and then a current lawsuit.  That was the extent of
15 the changes made.

16     Q    As someone who is being offered as an
17 expert, do you agree that it is not in your role to
18 be an advocate?

19     A    Completely agree.

20     Q    When you read Mr. Andy Gass's deposition,
21 did you form any opinions regarding his
22 representation of Ms. Mason?

23     A    I am not going to be offering any
24 criticism of Mr. Gass's representation at trial.

25     Q    I'm really trying to ask you, in terms of

1  were you able to determine from his testimony what
2  claims he thought he was submitting to State Farm?
3       A    Well, I think he thought he was submitting
4  a liability claim as well as a UM claim.
5       Q    Now, in that context, are you using UM as
6  an uninsured claim or underinsured claim?
7       A    I think he was contemplating a UIM or
8  underinsured claim.
9       Q    And that would be against Ms. Harrison?
10      A    Yes.
11      Q    Okay.  And did you see the accident
12 report?
13      A    Yes.
14      Q    Okay.  Did you note in the accident report
15 that the officer indicated Ms. Harrison was
16 uninsured?
17      A    I'm sure I did at one point in time.  That
18 does sound familiar.
19      Q    And that turns out to be an incorrect
20 statement?
21      A    Correct.
22      Q    That's why I bring this.
23      A    Are you cold?
24      Q    I'm always cold.
25      A    So am I, but I've got a jacket on.  If you

1     THE VIDEOGRAPHER:  Back on the record at
2 11:14 a.m.
3     Q    (BY MR. ACQUAVIVA)  Mr. Pignato, we are
4 back on the record.  As I explained earlier, it is
5 my custom and practice to ask the witness if, during
6 the break, they've thought of anything that they
7 would like to go over or change from their prior
8 testimony.  I will offer you that same courtesy or
9 are you ready to move forward?
10    A    All right.  Thank you.  And feel free to
11 interrupt me any time you have a question; okay?
12    Q    All right.  What I'd like to do at this
13 point before we conclude your deposition is to be
14 sure that I have all the opinions that you intend to
15 offer should the court permit you to do so.
16    A    Right, and I am focusing on a very narrow
17 issue in this case, and that's the issue of one
18 adjuster handling both the liability and UM claims
19 when it's a double State -- State Farm situation or
20 a -- what do you call it, a wedge?
21    Q    I think double width.
22    A    Double width.  Okay.  That's interesting.
23 All right.  So I testified -- or I stated in my
24 report in this case that I believe an actual
25 conflict of interest arose in this case because of

1  the position taken by Ms. Harrison at one point in
2  time that there was a phantom driver.  You know,
3  absent that particular evidence, I'm not so sure
4  that the conflict would have ripened into an actual
5  conflict.  It would have remained a potential
6  conflict, but, you see, when you get into this
7  situation where you've got one adjuster handling
8  both the liability and UM claims, you run the risk
9  of having that rise to the level of an actual
10 conflict of interest.  That's what I think happened
11 here.
12             Quoting from that Kentucky case that I was
13 talking about, and then I quoted from in my report,
14 the Oklahoma Supreme Court in Garnett said, "The
15 potential for mischief must be shown to have ripened
16 into the reality of tortious conduct."  I believe
17 that that occurred in this case.  I just tried to
18 distinguish some of the facts in the present case
19 from the facts in the Garnett case where the court
20 said there was no actual conflict of interest.
21             For example, in the Garnett case, there
22 were actually two different examiners.  In the -- in
23 the current case, there was just one examiner or
24 adjuster, and then that adjuster answered to one
25 supervisor.  And I'm not necessarily opposed to the

```
 1   use of one supervisor either, although I think it's
 2   safer to combine the two further up the chain.  I'd
 3   like -- personally like to see a supervisor for each
 4   adjuster.  Assuming there's an adjuster on the
 5   liability claim, an adjuster on the UM claim, I'd
 6   like to see them each have a supervisor, and then
 7   further up, either at that point or even further up,
 8   they can have one common supervisor.  That's what I
 9   teach and train my clients to do, and I think most
10   of them do it that way, but I'm not too upset with
11   that, but I am bothered by the fact that this
12   phantom vehicle claim arose, and I didn't see
13   sufficient attention given to it by the adjuster.
14   And I believe that's because she found herself in a
15   conflict situation.
16            On one hand, she's trying to fulfill her
17   duty of good faith to her liability insured,
18   Ms. Harrison, by keeping -- by settling the claim or
19   keeping the verdict within the policy limits to
20   avoid an excess verdict and excess exposure to
21   Ms. Harrison, and then, on the other hand, she has
22   an absolute duty to explore other possible avenues
23   of UM claims for Ms. Mason, and she didn't do that.
24   When this phantom vehicle issue came to light, she
25   should have discussed that subject matter with
```



1  Ms. Mason and discussed the possibility and
2  recommendation of opening up a separate UM claim
3  with respect to the phantom driver.  That didn't
4  happen, and that's where I focus my criticism in
5  this case, and I think I've addressed it
6  sufficiently in my report.
7          So, Jay, I would ask you to give -- ask me
8  whatever questions you have about what I've just
9  said and what I've expressed in my report.
10     Q    Can we agree first I haven't interrupted
11 you and I've given you a chance to say whatever it
12 is you wanted to say?
13     A    Sure.
14     Q    Okay.  Part of what I believe I heard you
15 say is that State Farm had an obligation to suggest
16 to Ms. Mason that the other party, Ms. Harrison, has
17 identified a phantom vehicle.  "Would you like to
18 make a UM claim?"
19          MS. RUST:  Object to the form.
20     Q    (BY MR. ACQUAVIVA)  Am I understanding
21 that correctly?
22     A    That's simplifying it, but, yes.
23     Q    Okay.  If Ms. Mason learned of the
24 presence of the alleged phantom driver from her
25 lawyer, would Ms. Mason have that opportunity at