```
 1              IN THE DISTRICT COURT OF LOGAN COUNTY

 2                       STATE OF OKLAHOMA

 3   CLYDE LAFFERTY, JR., and
     SHEILA LAFFERTY, individually,
 4   and as Parents and Next
     Friends of K.L. and E.L.,
 5   minor children,

 6        Plaintiffs,
     vs.                              No. CJ-2017-223
 7
     JESSICA BUTLER, an individual,
 8   and STATE FARM MUTUAL
     AUTOMOBILE INSURANCE CO.,
 9   d/b/a STATE FARM INSURANCE
     CO., a foreign for-profit entity,
10
          Defendants.
11
          VIDEOTAPED DEPOSITION OF 3230(C)(5) WITNESS
12                       JASON MOORE
             TAKEN ON BEHALF OF THE PLAINTIFFS
13       ON MARCH 13, 2020, BEGINNING AT 9:37 A.M.
                 IN OKLAHOMA CITY, OKLAHOMA
14   APPEARANCES

15   On behalf of the PLAINTIFFS:

16   Simone Gosnell Fulmer
     Andrea R. Rust
17   FULMER SILL
     1101 N. Broadway, Suite 102
18   Oklahoma City, Oklahoma 73103
     (405) 510-0077
19   sfulmer@fulmersill.com

20   On behalf of the DEFENDANT STATE FARM INSURANCE CO.:

21   Michael W. Brewer
     HILTGEN & BREWER
22   9505 North Kelly
     Oklahoma City, Oklahoma 73131
23   (405) 605-9000
     mbrewer@hbokc.law
24
     VIDEOTAPED BY:  Stesha Snow
25   REPORTED BY:  Jane McConnell, CSR RPR CMR CRR
```

EXHIBIT 13

```
 1    these?

 2              MS. RUST:  Uh-huh.

 3              MS. FULMER:  Because I don't want Mike to

 4    not have something.  What I attempted to do -- we'll

 5    call this Exhibit 11.

 6              MR. BREWER:  You already have an 11.

 7              MS. FULMER:  I'm sorry.  I meant to say

 8    12.  Thank you.

 9              (Exhibit 12 marked for identification.)

10              MS. FULMER:  We will call this Exhibit 12.

11              MS. RUST:  You'll have to lay them

12    side-by-side.

13              MS. FULMER:  I taped mine together.

14              MR. BREWER:  Obviously it goes in date

15    order.

16              MS. RUST:  That's right.

17              MS. FULMER:  Yes.

18         Q    (BY MS. FULMER)  Exhibit 12 that I put in

19    front of you is just meant to be an aid for you and

20    me today as we talk about the topics we're going to

21    talk about.  Okay?

22         A    Yes, ma'am.

23         Q    I am not professing or trying to tell you

24    this is the way it is.  In fact, I want you to kind

25    of help me where I might have not gotten it right.
```

1    Okay?

2        A    (Witness nods affirmatively.)

3        Q    But from a generic standpoint, what I

4    tried to do is track since 1997 State Farm's

5    treatment of double-insured claims in Oklahoma.

6    Do you see that?

7        A    Yeah.  I'm just looking at this for the

8    first time.  Yeah.  I think I kind of track what --

9        Q    You see what I was trying to do?

10       A    Yes, I believe so.

11       Q    I said it was double insured in Oklahoma,

12    but I must actually say there are some national

13    standards in there when it's talking about ACM

14    changes.  ACM changes are intended to be nationally;

15    correct?

16       A    The auto claim manual is, yes.  It applies

17    across the company.

18       Q    So if you will for me, and this is just me

19    asking because I didn't ask for it in the notice,

20    but if you know, do you know when Oklahoma first set

21    up the specialty UM units?

22            MR. BREWER:  Object to the form.

23       A    I don't -- I don't remember exactly when

24    that might have been.

25       Q    (BY MS. FULMER)  Okay.  I recognize I'm

1   **asking you something that wasn't necessarily on the**

2   **notice, but it might have come up.  So I thought I'd**

3   **ask.**

4           **It's fair, based on your own history,**

5   **that you were not handling Oklahoma UM claims in**

6   **1997?**

7       A    In 1997, now you're going to make me

8   backtrack on my history, I would have been in the

9   state of Kansas, I believe, in 1997.  So typically,

10  no, I would not have been handling Oklahoma UM

11  claims.

12      **Q    And as we know, Oklahoma had two teams**

13  **that were handling Oklahoma UM claims, and one was**

14  **in Edmond and one was in Norman; correct?**

15          MR. BREWER:  Object to the form.

16      A    I mean, I'm not sure when that started,

17  but at some point, yes, we had two teams that were

18  handling claims, UM claims, primarily in Oklahoma

19  City and Norman or Edmond, I'm sorry, Edmond and

20  Norman.

21      **Q    (BY MS. FULMER)  And the team leaders of**

22  **those or team managers of those were Oscar Rodriguez**

23  **and Jason Taylor?**

24      A    Yes, ma'am, that's correct.

25      **Q    And did you happen to read Jason Taylor's**

1    deposition from the case of Christie versus State

2    Farm?

3        A    I did not.

4        Q    He testified in that case as a corporate

5    representative as you are sitting here today.  Are

6    you aware of that?

7        A    I don't know that I was aware that he was

8    a corporate representative, no.

9        Q    Mr. Taylor was presented to testify about

10   State Farm's UM, Oklahoma UM handling.  Okay?

11       A    I'll take your word for that.

12       Q    And he described himself as pretty much

13   the expert on Oklahoma UM.  Were you aware of that?

14       A    I was not.

15       Q    Are you -- do you have any knowledge of

16   him being at any point in time the UM expert in

17   Oklahoma?

18       A    I don't know that we ever designated

19   anybody the UM expert.  I know Jason had some -- a

20   lot of experience handling Oklahoma UM claims.  I

21   don't know that I would have ever called him the

22   expert.

23       Q    In fact, with a lot of experience comes

24   expertise.  Wouldn't you agree with that?

25       A    Sometimes, yes.

1      Q    Mr. Taylor was over a team of UM adjusters

2   for over 15 years.  Are you aware of that?

3      A    I don't recall the dates, but that would

4   actually be surprising to me that it would have been

5   that long, but it's possible.

6      Q    His testimony in the Christie case was

7   that from 1999 until 2014 he was team manager of a

8   UM team that handled Oklahoma UM claims.

9      A    I have no doubt to doubt --

10          MR. BREWER:  Object to the form.

11     A    I'm sorry.  I have no doubt to doubt his

12   testimony or no reason to doubt his testimony.

13     Q    (BY MS. FULMER)  And were you aware that

14   those units were handling -- and I think you said

15   primarily Oklahoma UM claims.  Is that what I

16   understood you to say?

17     A    In my experience, they would have handled

18   other claims involved, potentially collision claims,

19   rental claims, those kind of things that were

20   ancillary to those UM claims as well.  That's my

21   recollection of that.

22     Q    No.  That's helpful.  Thank you.

23          So when the UM adjuster had a claim which

24   the jury already knows from other depos that were

25   first-party claims, that adjuster might also handle

1    are on your timeline.  We might have had Kansas

2    claims.  We might have had Arkansas, Louisiana,

3    Missouri.  It just depends on where we fall in this

4    timeline and, bluntly, I can't remember when we went

5    from region to zone.  I'd have to be reminded on

6    those dates.

7          Q    Okay.  If it would help you and me, if you

8    will look at Exhibit 12.  When I am talking about

9    the UM specialty units, I am going to be talking

10   about anywhere that that blue arrow covers.  Are you

11   with me?

12         A    The darker blue arrow, the top arrow.

13         Q    Yes, the one at the top.

14         A    Okay.

15         Q    So from 1997 through to the mid 2014, do

16   you see where I am?

17         A    Yes.  This darker blue arrow, yes.

18         Q    And we can agree that sometime in the fall

19   of 2014 the Oklahoma specialty units were no longer

20   in existence; true?

21              MR. BREWER:  Object to the form.

22         A    I believe that's about the right timing

23   for that, yes.

24         Q    (BY MS. FULMER)  Do you have an exact date

25   when that happened?

1      A    I do not have an exact date.

2      **Q    But it's fair to say that through sometime**

3  **in the latter part of 2014 Oklahoma UM claims were**

4  **being handled in specialty units?**

5           MR. BREWER:  Object to the form.

6      A    Sometime in the middle of 2014, yes, I

7  would think that's correct.

8      **Q    (BY MS. FULMER)  And as we already**

9  **established, 1997 is a guess on my part, and you're**

10  **not quite sure when Oklahoma started with those UM**

11  **units?**

12     A    I don't recall when we started.

13     **Q    But if we leave 1997 as approximate and**

14  **take it through to mid 2014, when I'm talking about**

15  **the Oklahoma UM specialty unit, that is the period**

16  **of time I'll be talking about.  Okay?**

17          MR. BREWER:  Object to the form.

18     A    Yes.

19          MR. BREWER:  And the reason I'm objecting

20  is I thought you said 1999 based on Jason Taylor's

21  testimony, and that's why I don't understand why you

22  have the extra two years.

23          MS. FULMER:  Just to clarify, that's when

24  Jason Taylor was over the unit.  I don't know that

25  it did not exist before.

1    for sure through the mid 2014, those specialty UM

2    units in Edmond and Norman, Oklahoma were handling

3    Oklahoma UM claims?

4        A    Yeah, along with the other what we -- I

5    think we deemed ancillary or similar coverages that

6    would go along with those, yes.  And they may have

7    been handling other states as well.  We also talked

8    about that.

9            Again, that wasn't in the notice.  I

10   didn't prepare to answer that.  This is my personal

11   experience and my personal recollection that they

12   may have been handling UM claims for other states as

13   well.

14       Q    And I believe his testimony makes clear

15   that he was --

16       A    Okay.

17       Q    -- during part of that time, and I agree

18   with you.  It moves around.

19       A    Yes.

20       Q    But we can be confident that at least 15

21   years Oklahoma UM claims were being handled isolated

22   from liability claims?

23            MR. BREWER:  Object to the form.

24       A    I think primarily that would have been the

25   case.  There may have been times when they weren't.

1   I personally can recall times when I did that on my
2   own, but that would have been -- most of the claims
3   were handled in those units, yes.
4        Q    (BY MS. FULMER)  In law school we're
5   taught general rule and exceptions to the general
6   rule.  As a general rule, that is true that UM and
7   liability claims were handled separately?
8        A    I would --
9             MR. BREWER:  Object to the form.
10       A    If you're talking about the timeline that
11   we have listed here, yes, ma'am.
12       Q    (BY MS. FULMER)  Thank you.  And the
13   exception to that general rule would be someone
14   might actually handle both for some off reason?
15       A    Yeah.  The facts and circumstances of all
16   different claims could make a different decision on
17   those.  I personally recall maybe handling both a
18   liability and a UM claim during that time frame,
19   but it would have been using your phrasing "the
20   exception, not generally the rule."
21       Q    Now, a UM claim and a liability claim are
22   not the same thing; true?
23       A    In what respect?
24       Q    They are two different claims under two
25   different policies?

 1  of a single car wreck?

 2          MR. BREWER:  Object to the form.

 3      Q    (BY MS. FULMER)  That's a double-insured

 4  claim; correct?

 5          MR. BREWER:  Object to the form.

 6      A    So are we looking at -- when you're

 7  talking about --

 8      Q    (BY MS. FULMER)  Let me strike that, and

 9  I'm going to say it again.

10      A    Okay.

11      Q    Exhibit 12 that I put there in front of

12  you, the title of that exhibit, do you see that?

13      A    Yes, ma'am.

14      Q    And I've titled it "State Farm's Treatment

15  of Double-Insured Claims."  Do you see that?

16      A    Yes, ma'am.

17      Q    And my goal was to kind of set out the

18  history of how State Farm treated double-insured

19  claims.  Does that seem to -- I think I've asked

20  you this already, but that seems to set that out,

21  attempts to?

22      A    Yes.  It attempts to set that out, yes,

23  ma'am.

24      Q    And just to be clear, a double-insured

25  claim is when or you guys also call it a "double

1  **with" claim, is when a UM claim and a liability**

2  **claim arise out of the same motor vehicle accident;**

3  **correct?**

4          MR. BREWER:  Object to the form.

5      A    Yes.

6      **Q    (BY MS. FULMER)  When there is both a**

7  **liability claim and a UM claim, there are duties**

8  **that State Farm owes to each one of the insureds**

9  **under those coverages; correct?**

10     A    Yes.

11     **Q    And you and I covered this exhaustively in**

12 **your last deposition, and I think you and I can**

13 **agree that the UM claim, the duty owed by State Farm**

14 **is to the injured party, and on the liability claim**

15 **the duty owed is to the person who is at fault;**

16 **correct?**

17         MR. BREWER:  Object to the form.

18     A    When you mean "duty owed," that's the only

19 thing that gets me a little --

20     **Q    (BY MS. FULMER)  Okay.**

21     A    I'm not really sure exactly what you're

22 talking about.  To me, I think about it as the

23 insuring agreement from both the coverages and how

24 those insuring agreements essentially seek to do the

25 same thing.

1    guess?  Are you asking me to -- I don't know.  What

2    are you asking me, I guess?

3         Q    Let me ask it a different way.  Does the

4    UM insurance company who owes me both a contractual

5    obligation and the duty of good faith and fair

6    dealing run a risk if it runs afoul of either of

7    those obligations to me?

8         A    Yes, ma'am.  Yes.

9         Q    As opposed to the liability carrier, does

10   it run any risk with regard to me if it is wrong?

11        A    With regard to you?

12        Q    Yes.

13        A    No.

14        Q    Back to Exhibit 12, we've already

15   established that this top line is intended to

16   represent the approximate time frame in which

17   Oklahoma had specialty units handling Oklahoma UM

18   claims; correct?

19        A    Yes.

20        Q    And then on the next line, this orange

21   shaded line, I have until 2005, kind of a shaded

22   orange line.  Do you see that?

23        A    I do see that.

24        Q    Then I have starting at 2005 a solid

25   orange line.  Do you see that?

```
 1        A    Yes.

 2        Q    And that solid line runs from 2005 through

 3   2010.  Do you see that?

 4        A    Yes, ma'am.

 5        Q    And that solid line is intended to

 6   represent when the ACM, which is the auto claim

 7   manual, says that the single adjuster practice is

 8   a conflict of interest or potential conflict of

 9   interest?

10        A    I think it says potential conflict of

11   interest.

12        Q    Yes.  And that is from 2005 through

13   somewhere approximately 2010 that the ACM indicates

14   that with regard to double-insured claims, there is

15   a potential for a conflict of interest and,

16   therefore, separate claims handlers are going to

17   be handling the UM claim and a liability claim;

18   correct?

19             MR. BREWER:  Object to the form.

20        A    It says there's a potential conflict of

21   interest, yes.

22        Q    (BY MS. FULMER)  And because of that

23   conflict of interest, State Farm's strategy is to

24   separate those claims?

25        A    In some instances it was, yes.
```

```
 1        Q    Was there an instance where the -- let's

 2   back that up.

 3             Consistent with our other discussion this

 4   morning, the general rule at State Farm, based on

 5   this idea that it is a potential for a conflict of

 6   interest, State Farm had separate adjusters handling

 7   those double-insured claims; correct?

 8        A    I think for that reason and maybe

 9   potentially many other reasons, yes.

10        Q    Do you know of any other reason why State

11   Farm had two adjusters handling the double-insured

12   claims during that period of time?

13        A    During the time when we're in orange?

14        Q    Yes, sir.

15        A    Now, this is based on my personal

16   experience, it was just having people that handled

17   those claims more often than other people.  We were

18   at that time what I would call highly segmented

19   where we did certain tasks, and that was just part

20   of our strategy in doing those.  Those were part of

21   the claims that we had decided to segment.  Like

22   maybe we segmented liability.  We segmented property

23   claims then.  We had a lot of different segmentation

24   at that time.

25        Q    If I'm to understand what you're saying
```

1    then, due to the fact that claims were segmented,

2    you -- double-insured claims would be handled by

3    two different people?

4        A    As a general rule?

5        Q    Yes.

6        A    Yes.

7        Q    But as a policy statement set forth in the

8    auto claim manual, the reason two adjusters handle

9    double-insured claims is because of the potential

10   for a conflict of interest; correct?

11       A    In the auto claim manual without -- you

12   know, if I looked at it again.  But, yes, the

13   phrasing is a potential conflict of interest from

14   the best of my recollection.

15       Q    And in the Exhibit 12 where I have that

16   shaded orange, the reason I have it shaded orange is

17   because I'm assuming during that period of time that

18   was also State Farm's position.  I have not seen

19   anything earlier than 2005.

20            Are you aware of what State Farm's

21   position was on the double-insured claims prior to

22   2005?

23       A    I am not.

24       Q    So perhaps Oklahoma was handling its UM

25   claims separately as indicated there on the Exhibit

1           MR. BREWER:  That way I won't be popping

2    off an objection as to form every time you refer to

3    Exhibit 12 in this area if you just give me that

4    continuing objection.

5           MS. FULMER:  Okay.

6           THE WITNESS:  I'm sorry.  Can we back up

7    to the last question.

8    **Q    (BY MS. FULMER)  Yes, because I've**

9    **forgotten what it was.  So I'll strike it and ask**

10   **it again because he was so rude in interrupting us.**

11   **I'll just restate it.**

12        A    Thank you.

13   **Q    Sometime in 2011 State Farm had a shift**

14   **in its approach to the handling of double-insured**

15   **claims; true?**

16        A    The approach in the mechanics of how we

17   did that, yes.

18   **Q    And that mechanic change was that State**

19   **Farm now wanted to have a single adjuster handle**

20   **both a liability and a UM claim arising out of the**

21   **same motor vehicle accident; true?**

22        A    That is correct.

23   **Q    And other than the mechanical change, the**

24   **other change that State Farm made was to set forth**

25   **its policy in the ACM that having a single adjuster**

1    **handle both of those claims was not a conflict of**

2    **interest; correct?**

3            MR. BREWER:  Object to the form.

4    A    It removed the language, yes.  It.  We

5    removed the language at that time, yes.

6    **Q    (BY MS. FULMER)  In fact, there are**

7    **different renditions and different versions that**

8    **went back and forth in the documents I reviewed.**

9    **You too?**

10   A    Yes.  There was a committee, a working

11   group I think we called it, that were having

12   conversations about those changes.

13   **Q    And my understanding of reading those**

14   **documents is that it was clear that State Farm's**

15   **philosophy had changed, and it no longer was relying**

16   **on this potential conflict of interest being the**

17   **reason to separate those claims.  Now it was**

18   **determining that it was not a conflict of interest**

19   **so a single adjuster could; correct?**

20           MR. BREWER:  Object to the form.

21   A    I'm not sure what all went into that

22   decision, but that's the -- that's how that decision

23   was communicated or at least written down in those

24   emails.

25   **Q    (BY MS. FULMER)  In your preparation for**

1    today, was there anything else that in any document

2    you read or in the discussions you had with counsel

3    that lead you to believe there was any other change?

4        A    Any other change in?

5        Q    Any other reason -- let me restate it.

6             We were talking about, if I believe, the

7    decision to go with a single adjuster handling those

8    claims --

9        A    Yes.

10       Q    -- and the philosophical shift in the ACM

11   that it was not a conflict of interest to have that

12   single adjuster handle both; right?

13            MR. BREWER:  Object to the form.

14       A    Yes.

15       Q    (BY MS. FULMER)  And we know from the

16   emails that you looked at, from discussions you had

17   with counsel, that that is the change that was made

18   to allow a single adjuster to handle both of those

19   claims?

20       A    Yes.

21       Q    So if you'll look back at Exhibit 12,

22   during the time in 2011 when it was decided at State

23   Farm that the single adjuster practice was not a

24   conflict of interest, Oklahoma continued handling

25   UM claims separately; did it not?

1          A     As a general practice, yes.

2          Q     And even though the general rule

3     nationally was that State Farm would have a single

4     adjuster handle double-insured claims, Oklahoma

5     continued with its specialty UM units; correct?

6          A     We did.

7          Q     And sometime in 2014, and I think we

8     established earlier this morning it was towards the

9     end perhaps of 2014, those UM specialty units were

10    disbanded; correct?

11               MR. BREWER:  Object to the form.

12         A     Yes.

13         Q     (BY MS. FULMER)  And the single adjuster

14    practice was now being applied to double-insured

15    claims in Oklahoma; correct?

16         A     As the general rule, yes.

17         Q     And this blue line and the yellow line I

18    carry all the way to 2020 because I have not seen

19    anything, unless you correct me, that the position

20    of State Farm is first that the single adjuster

21    practice is not a conflict of interest; that

22    remains?

23         A     That is correct.

24         Q     And it remains that in the State of

25    Oklahoma double-insured claims are handled by a

1    single adjuster?

2         A    As a general rule, yes.

3              MS. FULMER:  We can take a break.

4              MR. BREWER:  Do you want to break for

5    lunch?

6              MS. FULMER:  Yes.

7              VIDEOGRAPHER:  We're off the record at

8    12:00 p.m.

9              (Break taken from 12:00 p.m. to 1:20 p.m.)

10             VIDEOGRAPHER:  We're back on the record at

11   1:20 p.m.

12        Q    (BY MS. FULMER)  Mr. Moore, we have just

13   taken a lunch break.  Are you ready to continue?

14        A    Yes, ma'am.

15        Q    And is there anything about your testimony

16   thus far today that you would like to clarify or

17   change in any way?

18        A    No, ma'am.

19        Q    When we left off, we were looking at

20   Exhibit 12.  I think we had kind of established

21   each of the lines, the different arrows, we had

22   established pretty much that they're kind of in the

23   right place for when those things were occurring at

24   State Farm; is that right?

25        A    I believe the arrows are, yes, in the

 1   right places.

 2        Q    In the notice that you were asked to

 3   testify on behalf of State Farm, in that notice we

 4   had asked some questions about the decision that was

 5   made by State Farm sometime in 2011 to go to the

 6   single adjuster practice of handling double-insured

 7   claims, and you're that witness who's going to

 8   testify on that; correct?

 9        A    Yes, ma'am.

10        Q    And one of the questions that we have

11   asked is why did State Farm go to that practice.

12   You're aware of that; correct?

13        A    Yes, ma'am.

14        Q    And in response to Interrogatory No. 5,

15   State Farm provided an answer to us that you

16   actually had verified.  Do you recall that?

17        A    I do remember it.

18             (Exhibit 13 marked for identification.)

19        Q    (BY MS. FULMER)  I'm going to give you a

20   document that I've marked as Exhibit 13.  And I, for

21   your benefit, went ahead and put a green sticker on

22   Interrogatory No. 5.

23             MR. BREWER:  Is that mine?

24             MS. FULMER:  Yes.  I did not do the

25   sticker for you.  I'm sorry.

1     Q    (BY MS. FULMER)  And then I also

2   highlighted Interrogatory No. 5.  It's there on --

3   I don't know what page you're on.

4     A    Nine.

5     Q    Nine.  The question itself is on Page 9.

6   The supplemental answer, which is actually the

7   operative answer in the case, comes on the next

8   page, and I have highlighted that supplemental

9   answer.  Do you see that?

10    A    Yes, ma'am.

11    Q    And going back to the actual interrogatory

12  itself, that interrogatory asks that State Farm

13  explain why it went to a single adjuster handling

14  those double-insured claims; correct?

15    A    That's what the interrogatory asks, yes.

16    Q    And when it came to answering that

17  interrogatory on Page 10, State Farm's response in

18  that amended answer was -- if you kind of look

19  through the objections, it basically says that the

20  change was made to improve customer service.  Do you

21  see that?

22    A    Yes, ma'am.

23    Q    The change was made to reduce duplication

24  of effort.  Do you see that?

25    A    Yes, ma'am.

1      Q     The change was made to increase

2   efficiency.  Do you see that?

3      A     I do.

4      Q     And the way I read the next, it was --

5   the change was made to increase consistency.

6      A     Yes.  It says "and consistency in claim

7   handling."

8      Q     And that is the reason why that was set

9   forth by State Farm for that change having been made

10   in 2011; correct?

11      A     Yes.  That's what the answer says, yes.

12      Q     And as the witness here today, is there

13   anything about that explanation of why that you want

14   to change or amend or add to?

15      A     I do not.

16      Q     Okay.  With regard to that change, one of

17   the things that we asked someone to testify about is

18   who made that decision to have a single adjuster

19   handle both a UM and a liability claim in 2011 when

20   the change was made.  Do you remember that?

21      A     Do I remember that question being posed?

22      Q     Yes.

23      A     Yes.

24      Q     And are you prepared today to tell us who

25   made that decision?