**EXHIBIT 24**

2009 WL 3157338
Only the Westlaw citation is currently available.
United States District Court,
N.D. Oklahoma.

Iris CANTRELL, as Administrator of the Estate of Larry Cantrell, Plaintiff,
v.
AMICA MUTUAL INSURANCE COMPANY, Defendant.

No. 08–CV–0546–CVE–PJC.
|
Sept. 25, 2009.

**Attorneys and Law Firms**

Philip Raymond Richards, Rachel Carver Mathis, Stephan Scott Mathis, Thomas David Hird, Richards & Connor, Scott Boudinot Wood, Wood Puhl & Wood, Tulsa, OK, for Plaintiff.

Adrienne Nichole Cash, George Eldon Gibbs, George R. Mullican, Gibbs Armstrong Borochoff Mullican & Hart, Tulsa, OK, Amy R. Steele, Peter Leighton Wheeler, Robert Stevens Lafferrandre, Pierce Couch Hendrickson Baysinger & Green LLP, Oklahoma City, OK, for Defendant.

### OPINION AND ORDER

CLAIRE V. EAGAN, Chief Judge.

**\*1** Now before the Court is Defendant Amica Mutual Insurance Company's Motion for Summary Judgment and Brief in Support (Dkt.# 42). Defendant Amica Mutual Insurance Company (AMICA) seeks summary judgment on plaintiff Iris Cantrell's claims of breach of insurance contract and bad faith,[1] arising out of AMICA's denial of Mrs. Cantrell's uninsured motorist claim.[2] AMICA argues that there are no genuine issues of material fact, and that it properly denied coverage of Mrs. Cantrell's claims. Further, AMICA argues that the denial of coverage was based, at a minimum, on a legitimate dispute as to coverage and, therefore, cannot have been in bad faith or warrant punitive damages. Mrs. Cantrell argues that there are genuine issues of material fact that preclude summary judgment on both her breach of contract and bad faith claims.

### I.

This case arises out of the tragic deaths of Officer Larry Cantrell and his father, Charles Cantrell. At around midnight on July 30, 2005, Officer Cantrell was on duty as a police officer for the City of Sapulpa, Oklahoma, and his father was riding along in his police car. Dkt. # 42, at 6–7. Officer Cantrell was one of several officers responding to a call regarding a vandalism in progress [3] and was driving at around 119 miles per hour south along New Sapulpa Road. *Id.* at 7. Officer Cantrell was driving "Code 2," which means with emergency lights on and without his siren on continuously.[4] As Officer Cantrell approached the intersection of New Sapulpa Road and Hilton Road, Nancy Gurno was driving through that intersection on Hilton Road. *Id.* She stopped at the stop sign, and then entered the intersection. *Id.* She then stopped somewhere in the intersection when she noticed Officer Cantrell's vehicle approaching.[5] *Id.;* Dkt. # 44, at 14. Officer Cantrell swerved and struck a curb. Dkt. # 44, at 14; Dkt. # 44, Ex. 9, at 111. Both Officer Cantrell and Charles Cantrell died in the resulting accident. Dkt. # 42, at 8.

AMICA had issued Officer Cantrell a standard automobile insurance policy that included uninsured motorists coverage.[6] Dkt. # 42, at 8–9. The policy states, "[w]e will pay compensatory damages which an insured [7] is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury: (1) Sustained by an insured; and (2) Caused by accident." Dkt. # 42, at 9. Mrs. Cantrell reported the accident to AMICA in mid-November 2005. Dkt. # 42, at 10. Originally, a claims supervisor drafted a memorandum stating "I do not see the need for opening the file, but make a miscellaneous and send a denial letter addressing the highlighted policy language enclosed." A regional claim manager responded "[b]ecause this is a double fatality, please open the file and convert." Dkt. # 44, Ex. 15, at 29. AMICA assigned investigation of the claim to Mark Diakun. Dkt. # 42, at 10. Mr. Diakun hired an independent adjuster, Ed Balcerak, to assist in his investigation. Dkt. # 42, at 11. AMICA also sent a "Notice of Reservation of Rights" letter to Mrs. Cantrell on December 1, 2005, informing her that AMICA was investigating whether her claim was covered.[8] Dkt. # 44, at 22.

**\*2** In conducting his investigation, Mr. Diakun viewed, among other things, the "dash cam" video taken from inside Officer Cantrell's vehicle at the time of the accident, the

official police report, witness statements given to the police department, and a television interview with Ms. Gurno. Dkt. # 42, Ex. 7, at 3–10. He also reviewed Mr. Balcerak's report from his interview of Officer Clark, the Sapulpa police officer who prepared the police report. *Id.* The parties disagree as to what this evidence tends to prove, and as to its reliability. For instance, the parties disagree as to whether the "dash cam" shows that Ms. Gurno's vehicle entered Officer Cantrell's lane. Mr. Diakun states that "[a]s I watched the video, I could not see where Gurno's vehicle penetrated into Officer Cantrell's lane of travel." Dkt. # 42, Ex. 7, at 5. Officer Clark stated to Mr. Balcerak that "it appears [from the video] Ms. Gurno's vehicle is coming across the eastbound lanes as Mr. Cantrell's vehicle approaches the intersection and then Ms. Gurno stops about two feet into this inside lane." [9] Dkt. # 44, Ex. 10, at 126. Mr. Diakun discovered facts which suggested to him that Officer Cantrell was primarily at fault, and facts that suggested to him that Officer Cantrell was not at fault. *Id.* In particular, Mr. Diakun chose to discount Officer Clark's opinion that Ms. Gurno was primarily at fault because Mr. Diakun had specific "concerns about this statement." *Id.* at 7.

In Mr. Diakun's opinion, Officer Cantrell was more than 50% at fault in the accident and, therefore, not "legally entitled to recover" from Ms. Gurno. Consequently, AMICA concluded that Mrs. Cantrell's claim was not covered under her son's insurance policy. Dkt. # 42, at 15. AMICA closed the file on May 31, 2007. [10] Dkt. # 44, at 23. Mrs. Cantrell called AMICA on June 11, 2007, to ask about the status of her claim, at which time she was told that the file was closed on May 31. Dkt. # 44, Ex. 36, at 27. AMICA sent a letter explaining its denial of coverage to Mrs. Cantrell's attorney on August 13, 2007. [11]

Mrs. Cantrell filed a petition in state court on April 14, 2008, and AMICA removed the case to this Court.

## II.

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v.. Catrett,* 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir.1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Id.* at 327.

**\*3** "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker,* 164 F.3d 1249, 1251 (10th Cir.1998).

## III.

AMICA seeks summary judgment on Mrs. Cantrell's claims for breach of contract and bad faith. In her state court petition, Mrs. Cantrell alleges that her claim was covered by the terms of Officer Cantrell's insurance policy, and that AMICA's denial of the claim was a breach of contract. She further alleges that AMICA breached its duty of good faith and fair dealing by failing to adequately investigate, evaluate, and make timely payment upon the claim. AMICA argues that it properly concluded that Officer Cantrell was more than 50% at fault in the accident, and that it is therefore entitled to summary judgment on Mrs. Cantrell's breach of contract claim. Further, AMICA argues that its denial of Mrs. Cantrell's claim was based on a legitimate dispute over coverage, and that it is therefore entitled to summary

judgment on Mrs. Cantrell's bad faith claim and associated request for punitive damages.

**A. Breach of Contract Claim**

Officer Cantrell's insurance policy pays compensatory damages "which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle...." Dkt. # 42, at 10. In this case, Mrs. Cantrell's claim is covered if Officer Cantrell would have been legally entitled to recover from Ms. Gurno. Cf. Bill Hodges Truck Co. v. Humphrey, 704 P.2d 94, 96 ("The actions of the tortfeasor are relevant ... to establish that the insured is 'legally entitled to recover' from an uninsured motorist, a condition of the insurer's promise.")

Oklahoma law bars recovery in a personal injury or wrongful death action if the injured person's negligence is of greater degree than the combined negligence of any other person or persons causing the injured person's damages. OKLA. STAT. tit. 23, § 13; see also Morris v. Sorrells, 837 P.2d 913, 915 (Okla.1992). Thus, in a two-party car accident, a person is not "legally entitled to recover" if he was more at fault for causing the accident than the other person. In this case, Mrs. Cantrell's claim is covered unless Officer Cantrell was more than 50 % at fault in causing the accident.

**\*4** "The question of causation in a negligent tort case is one of fact for the jury. It becomes one of law only when there is no evidence from which the jury could reasonably find a casual link between the negligent act and the injury or where the facts are undisputed." Mansfield v. Circle K. Corp., 877 P.2d 1130, 1135–36 (Okla.1994). The Oklahoma Constitution requires that "the defense of contributory negligence or of assumption of the risk shall in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury." OKLA. CONST. art. XXIII, § 6. There is an exception to this rule where "upon undisputed facts, reasonable people exercising fair and impartial judgment could not reasonably reach different conclusions concerning them." Flanders v. Crane Co., 693 P.2d 602, 606 (Okla.1984).

AMICA argues that this case falls under the exception. It argues that, based upon the undisputed facts, reasonable people exercising fair and impartial judgment could not reasonably conclude that Ms. Gurno was more than 50% at fault in causing the accident. AMICA is incorrect. Even based on the few undisputed facts in this case, reasonable people could reasonably conclude that Ms. Gurno was more at fault than Officer Cantrell. For example, it is undisputed that Ms. Gurno's vehicle was *somewhere* in the intersection as Officer Cantrell approached. From this evidence, reasonable people could reasonably conclude that Ms. Gurno was more at fault for the accident, and thus that the defense of contributory negligence would not bar Officer Cantrell's recovery. Therefore, this case does not fall within the exception to Oklahoma's constitutional requirement.

Further, there are genuine issues of material fact sufficient to preclude summary judgment. For example, the parties disagree as to how far across the intersection Ms. Gurno's car stopped. AMICA argues that Ms. Gurno "braked within the center turn lane before she entered the southbound traffic lanes," Dkt. # 42, at 8, while Mrs. Cantrell provides evidence that Ms. Gurno could have been two feet into Officer Cantrell's lane, Dkt. # 44, at 14. The location of Ms. Gurno's vehicle is material to determining who was more at fault in the accident. This dispute alone is sufficient to preclude summary judgment in favor of AMICA. Yet, there are additional genuine issues of material fact in this case. For example, the parties also disagree as to whether Officer Cantrell's speed was unreasonable under the circumstances. AMICA stresses that the official accident report states that Officer Cantrell was traveling at an "unsafe speed." Dkt. # 42, Ex. 3, at 2. Mrs. Cantrell has provided evidence suggesting that other officers involved in the same pursuit drove at similar speeds, Dkt. 44, Ex. 2, at 30, and that police officers may drive at high speeds when responding to an officer's assistance call, Dkt. # 44, Ex. 6, at 92. A reasonable person could reasonably conclude that Officer Cantrell was not negligent for driving at 119 miles per hour under the circumstances of the accident. For these reasons, AMICA is not entitled to summary judgment on Mrs. Cantrell's breach of contract claim.

**B. Bad Faith**

**\*5** AMICA also requests summary judgment on Mrs. Cantrell's claim that AMICA breached its duty of good faith and fair dealing. AMICA argues that it cannot have acted in bad faith because its claim denial was based on a legitimate dispute as to the comparative fault of Officer Cantrell and Ms. Gurno. Dkt. # 42, at 21–22. Mrs. Cantrell argues that AMICA's claim denial was not legitimate, and that AMICA's conduct in handling the claim violated its duty of good faith and fair dealing.

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured." Christian v.

*Am. Home Assurance Co.,* 577 P.2d 899, 904 (Okla.1977). Violation of this duty gives rise to an action in tort. *Id.* "The essence of the tort of bad faith, as it is recognized in Oklahoma, is the unreasonableness of the insurer's actions."

*Conti v. Republic Underwriters Ins. Co.,* 782 P.2d 1357, 1360 (Okla.1989). The Oklahoma Supreme Court and the Tenth Circuit have made clear that an insurer does not subject itself to a claim of bad faith merely by disputing coverage. "The insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate.' " *Thompson v. Shelter Mut. Ins.,* 875 F.2d 1460, 1462 (10th Cir.1989) (citing *Manis v. Hartford Fire Ins. Co.,* 681 P.2d 760, 762 (Okla.1984)). "The decisive question is whether the insurer has a 'good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under the policy.' " *Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105, 1109 (Okla.1991) (quoting *Buzzard v. McDanel,* 736 P.2d 157, 159 (Okla.1987)). In order to succeed on a claim for bad faith, the claimant must be able to prove that the insurer's actions went beyond an act of simple negligence; however, it is not necessary to prove that the insurer acted recklessly to prove liability, even though recklessness is a requirement for punitive damages in a bad faith claim. *Badillo v. Mid Century Ins. Co.,* 121 P.3d 1080, 1094 (Okla.2005). The Court can consider only the "facts known or knowable about the claim at the time the insured requested the insurer to perform its contractual obligation." *Sims v. Travelers Ins. Co.,* 16 P.3d 468, 471 (Okla.Civ.App.2000); *see also* *Timberlake Const. Co. v. U.S. Fid. & Guar. Co.,* 71 F.3d 335, 340–41 (10th Cir.1995). "[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle v. Great Atlantic Ins. Co.,* 637 P.2d 583, 587 (Okla.1981).

AMICA argues this Court cannot simultaneously deny it summary judgment on Mrs. Cantrell's breach of contract claim and her bad faith claim. Essentially, AMICA argues that genuine issues of material fact on the breach of contract claim necessarily mean that its claim denial was based on a legitimate dispute over coverage. "[T]he fact that a reasonable jury could find in favor of the insurer based on all facts known or that should have been known by the insurer when it denied a claim is strong evidence that a dispute is 'legitimate.' " *Timberlake,* 71 F.3d, at 344 (quoting *Oulds v. Principal Mut. Life Ins. Co.,* 6 F.3d 1431, 1442 (10th Cir.1993)). However, "the simple presence of a legitimate dispute does not necessarily end the inquiry. Instead, it shifts the burden to the insured to present additional evidence of bad faith." *Sims,* 16 P.3d at 891; *see also Timberlake,* 71 F.3d at 345 ("as a matter of law [insurer] did not breach the duty of good faith *merely* by refusing to pay Timberlake's claim. Thus, Timberlake needed to produce additional evidence of bad faith in order to send the issue to the jury."); *Buzzard,* 824 P.2d at 1108–09 ("The insurer's duty includes, *but is not limited to,* the duty not to unreasonably withhold payment of claims.") (emphasis added). [12]

**\*6** In this case, Mrs. Cantrell alleges that AMICA breached its duty of good faith and fair dealing by "failing to adequately investigate, evaluate and make timely payment upon the claim." Dkt. # 3, Ex. 1, at 3. "[W]hen a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information." *Timberlake,* 71 F.3d at 345; *see also Sims,* 16 P.3d at 891. Mrs. Cantrell has raised genuine issues as to whether AMICA overlooked relevant material facts, and as to whether a more thorough investigation would have produced relevant information. For example, Mrs. Cantrell argues that Mr. Diakun improperly disregarded the opinion of Officer Clark, a trained accident reconstructionist, in favor of his own opinion regarding who was at fault in the accident. Dkt. # 44, at 16. Mrs. Cantrell suggests that Mr. Diakun should have attempted to clarify his concerns about Officer Clark's statements, rather than discount them. *Id.* at 17. Based on this evidence, a jury could reasonably find that Mr. Diakun disregarded material facts. Further, Mrs. Cantrell raises a genuine issue as to whether AMICA could have discovered additional relevant information if it had hired its own accident reconstructionist, which Mr. Diakun chose not to do. Dkt. # 44, Ex. 39, at 35. [13]

Mrs. Cantrell has also offered sufficient evidence from which a jury could find that AMICA handled her claim in bad faith. Mrs. Cantrell has offered evidence that AMICA originally was not going to investigate her claim at all, Dkt.

# 44, Ex. 15, at 22, attempted to keep her from retaining an attorney, Dkt. # 44, at 22, and closed her file without communicating its decision to her in a timely manner, *id.* at 22. Mrs. Cantrell did not learn of AMICA's decision until over a year and a half after she notified AMICA. When discussing the insurer's duty of good faith and fair dealing the Oklahoma Supreme Court has stated that "[o]f particular importance is the delicate position of the insured after a loss is incurred...." *Buzzard,* 824 P.2d 1109. Particularly in light of its knowledge that Mrs. Cantrell lost her son and husband, a jury could reasonably find that AMICA's conduct towards Mrs. Cantrell was unreasonable under the circumstances. Therefore, AMICA is not entitled to summary judgment on Mrs. Cantrell's bad faith claim.

### C. Punitive Damages

A jury may award punitive damages if it finds, by clear and convincing evidence, that an insurer has recklessly disregarded its duty to act in good faith with its insured, or that an insurer has intentionally and with malice breached its duty to act in good faith with its insured. OKLA. STAT. tit. 23, § 9.1; *see also, e.g., Badillo,* 121 P.3d at 1105. "The availability of punitive damages in a case by an insured against his/her insurer for breach of the implied duty of good faith and fair dealing is not automatic, but rather is governed by the standard applicable in other tort cases. Even where there is evidence to support recovery of actual damages in this type of case, submission of the issue of punitive damages to a jury may be improper." *Id.* at 1106 (citation omitted). At a minimum, the insured must provide evidence of "reckless disregard toward [the insured] from which malice and evil intent may be inferred." *Id.* Based on the evidence discussed in part III.B., *supra,* and viewing the record in the light most favorable to the party opposing summary judgment, this Court concludes that Mrs. Cantrell has presented sufficient evidence from which a jury could find that AMICA acted with reckless disregard, or even "oppression, malice, ... gross negligence or wantonness" *Buzzard,* 824 P.2d at 1115, in handling her claim. Therefore, AMICA is not entitled to summary judgment on Mrs. Cantrell's claim for punitive damages.

**\*7** IT IS THEREFORE ORDERED that Defendant Amica Mutual Insurance Company's Motion for Summary Judgment and Brief in Support (Dkt.# 42) is **denied.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3157338

### Footnotes

| | |
|---|---|
| 1 | "The phrase 'bad faith' is used here as a shorthand reference to a breach of the duty of good faith and fair dealing. *Brown v. Patel,* 157 P.3d 117, 121 n. 5 (Okla.2007). |
| 2 | Mrs. Cantrell brings her claims on behalf of Officer Cantrell's estate. Dkt. # 3, Ex. 2, at 3. |
| 3 | The parties provide differing characterizations of the call's urgency. It is undisputed that the officer who made the call for assistance was alone and pursuing multiple suspects. Dkt. # 44, at 13; Dkt. # 78, at 1. It is also undisputed that Officer Cantrell did not "bump" his siren as he approached the intersection at issue. Dkt. # 42, at 12. |
| 4 | The parties disagree as to whether and how often Officer Cantrell and the other responding officers "bumped" their sirens while driving. *Compare* Dkt. # 42, at 7; with Dkt. # 44, at 14. |
| 5 | The parties disagree as to where in the intersection she stopped. AMICA argues Ms. Gurno stopped in the center turn lane, while Mrs. Cantrell argues Ms. Gurno's vehicle was at least partially in the southbound lane from which Officer Cantrell was approaching. Dkt. # 42, at 8; Dkt. # 44, at 14. The parties agree that Ms. Gurno had, at least, proceeded past the stop sign at the entrance to the intersection. |
| 6 | Ms. Gurno did not have automobile insurance at the time of the accident. Dkt. # 44, Ex. 9, at 117. |
| 7 | "Insured" means the policyholder or any family member. Dkt. # 42, Ex. 4, at 32. However, Mrs. Cantrell does not make a claim on her own behalf, but claims benefits on behalf of Officer Cantrell's estate. Dkt. # 3, Ex. 2, at 3. |

**Cantrell v. Amica Mut. Ins. Co., Not Reported in F.Supp.2d (2009)**
Case 5:20-cv-01217-D   Document 84-24   Filed 09/26/22   Page 6 of 6
2009 WL 3157338

| | |
|---|---|
| 8 | Mrs. Cantrell has presented evidence suggesting that AMICA noted that she did not have an attorney when she told AMICA of her loss, and that AMICA wanted to ensure that the "tone of the reservation rights letter" did not lead Mrs. Cantrell to hire one. Dkt. # 44, at 22. AMICA argues that it just wanted to make sure that Mrs. Cantrell understood what was being said. Dkt. # 78, at 5. |
| 9 | AMICA argues that this statement is inconsistent with Officer Clark's conclusion in the official accident report, and Officer Clark's prior statement to Mr. Balcerak. Dkt. # 42, at 14. Mrs. Cantrell disagrees. Dkt. # 44, at 20. |
| 10 | Mr. Diakun attempted to contact Mrs. Cantrell's attorney three times before AMICA closed the file; however, these letters were sent to the wrong address. Dkt. # 78, at 6. |
| 11 | Mrs. Cantrell argues that AMICA's *investigation* of the claim closed on August 2, 2006, almost ten months before the file was closed, and over one year before the August 13 letter. Dkt. # 44, at 23. AMICA has not directly responded to this argument. *See* Dkt. # 78, at 6. |
| 12 | Thus, AMICA's contention that "if the Court determines that reasonable minds could differ as to whether there was a breach of contract under the factual and procedural posture of this case, there simply can be no finding that AMICA breached its duty of good faith and fair dealing," Dkt. # 78, at 9, is incorrect as a matter of law. AMICA's own brief contradicts its argument by citing Sims, stating "[b]ased on the finding of a legitimate dispute, the Tenth Circuit found that additional evidence would be required for the bad faith claim to survive a motion for judgment as a matter of law." Dkt. # 42 at 25. |
| 13 | AMICA contends that Mrs. Cantrell relies on evidence "adduced after this litigation began" to support her case, and suggests that this Court cannot consider such evidence under the rule of *Buzzard*. Dkt. # 78, at 7. However, AMICA fails to point to any specific evidence that would fall under this rule. Further, the court in *Buzzard* held that an insurance company could not rely on information it had obtained after denying a claim to support that denial. 824 P.2d at 1114. Nothing in *Buzzard* suggests that information *Mrs. Cantrell* obtained after AMICA denied her claim would not be relevant to the reasonableness of AMICA's denial decision or its conduct, provided AMICA could have discovered that evidence if it tried. To find otherwise would allow insurance companies to defeat claims of inadequate investigation simply by conducting inadequate investigations and later claiming that the insured cannot rely on information the insurer did not have at the time the claim decision was made. |

**End of Document**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.